238 S.W.2d 464 (1951)
KERBY
v.
MISSOURI STATE HIGHWAY COMMISSION et al.
No. 21507.
Kansas City Court of Appeals, Missouri.
April 2, 1951.
*465 Crawford & Harlan, Earl T. Crawford, and Samuel P. Harlan, all of Sedalia, for appellant.
John T. Martin and Martin & Gibson, all of Sedalia, for respondents.
BOUR, Commissioner.
This is an appeal from a judgment of the circuit court affirming a final award of the Industrial Commission in a proceeding under the workmen's compensation law. Claimant-appellant is the widow of the deceased employee, Robert E. Kerby. The defendants are the employer and the insurer. The appeal is here because of the amount involved. Const. of 1945, Art. V, secs. 3, 13, Mo.R.S.A. The average weekly wage of the employee was admitted to be $26.40, and claimant concedes that "the maximum amount of compensation which can be claimed for this employee's death is $5680.00." Sec. 287.240, R.S.Mo.1949, Mo.R.S.A. § 3709.
The claim filed June 23, 1948, alleged that on April 26, 1946, Robert E. Kerby suffered accidental injuries while lifting a concrete slab into a truck; that the accident occurred in the course of and arose out of his employment by the Missouri State Highway Commission; that as a result of the accident his "heart, muscles, nerves and veins thereof, the sympathetic nerve, the stomach, and surrounding region" were injured; that such injuries caused his death on June 16, 1948.
The defendants, in their answer, denied that the "employee sustained any accident as alleged which resulted in bodily injury as claimed or occasioned the disability from which he suffered or which caused his death," and alleged that "the employee's disability and death were attributable to disease, and particularly coronary thrombosis and its producing causes, and that such conditions developed through and by reason of natural causes."
The matter was heard before a referee who found "from all the evidence that claimant failed to prove that employee's death was the result of an accident arising out of and in the course of his employment as alleged, therefore, compensation must be and is accordingly denied." Upon review, the full commission made the same finding and denied compensation. Claimant appealed to the circuit court, which affirmed the final award of the commission. The appeal to this court was then perfected. A rather detailed review of the evidence is required.
The record shows that the employee, Robert E. Kerby, filed a claim for compensation on account of the alleged injury here in question, and while that claim was pending his deposition was taken by the employer and its insurer. At the hearing in the present case the claimant offered this deposition in evidence, and it was admitted without objection. Kerby testified that on April 26, 1946, he was working with other members of a crew loading broken concrete slabs into trucks; that about 3:30 that afternoon as he was attempting to lift a piece of concrete into a truck, it caught on the side of the truck bed and "started back"; that he caught it between his chest and the truck bed and held it there until he got his hands under it and "pushed it over"; that as he "started over with it" he had a sharp pain in his chest"the lower end of the breast bone"and another such pain as he pushed the piece of concrete over the top of the truck bed. He was unable to estimate the weight or size of the piece of concrete. He further testified that the piece of concrete did not actually fall as he had his hands on it at all times, and it only "came back" about a foot; that when his foreman arrived about five minutes later, he told him that "something happened" and that he "felt pretty bad, but didn't tell him what happened"; that he worked the rest of the day but did not lift any heavy objects; that he returned to work the next day (Saturday); that the following Monday he consulted Dr. W. E. Walker, a practicing physician at La Monte, Missouri; that he worked on May 2d and 3d and for a time on May 4th, 1946, but not thereafter.
Kerby further stated that after the occurrence in question he "got sore all over and stayed that way until I began having those coronary pains"; that about May 15, *466 1946, he had "a spell of something like indigestion" and a similar attack on May 28th; that on June 3d or 4th he had a severe attack which lasted about thirty minutes, during which time he could hardly breathe and he suffered from severe pain in his chest; that he had another attack that same afternoon, followed by similar attacks during the next few days; that on June 12, 1946, he entered Research Hospital in Kansas City, where he remained for six weeks; that upon returning home he went to bed and stayed there for ten weeks, and continued: "I never had any pains after that. * * * After that it would generally come on me in the nightlike someone holding their hand over my mouth and nose. * * * Now I feel like a person would if they were gassed." He further testified that prior to April 26, 1946, he had been in good health. His deposition was taken on August 8, 1947, and he died on June 16, 1948.
The claimant testified that on April 26, 1946, the date of the alleged accident, her husband was brought home by his foreman, Earl Miller; that he was "complaining of pain" and had a "red place" in the "pit of his stomach"; that the skin was not broken and there was "no dark, black or blue area, indicating a bruise"; that the "red place" was just a "red streak" about three inches long; that in June, 1946, he was taken to Research Hospital in Kansas City, where he remained for six weeks under the care of Dr. Davis and Dr. Saunders; that he was in bed for ten weeks after he returned home; that thereafter his condition improved, but it got "considerably worse" in February, 1948, at which time it was discovered that he had an umbilical hernia. In March, 1948, he was taken to a hospital where he remained for three weeks. He died at his home. Claimant further testified that her husband was 68 years of age at the time of his death, and that she was his sole dependent; that he had been in good health prior to April 26, 1946, but he never worked after that date.
On April 26, 1946, Kerby was working with a crew under a foreman named Earl G. Miller, who testified as a witness for claimant that he was not present at the time of the alleged accident, and continued: "I'd been gone until about three in the afternoon and came back, Mr. Kerby said to me, he said `Earl I got a lick.'" Miller stated that he told Kerby to "get a drink and sit down and rest, and he did," but a short time thereafter "he was out picking up small rocks"; that the crew "loaded up a load to take up to another place" and Kerby "complained of getting so sore on the road, the jerking of the truck on the trip just hurt his muscles, and such as that, now, that is about all I can tell you about that part of it." Miller further testified that Kerby returned to work the next morning (Saturday) but complained of being sore "right at the lower end of the breast bone"; that "you could tell when he stooped over there was something bothering him, he went at it very easy"; that the following Monday he performed light work all day, but complained of pains and "couldn't hardly get around"; that he did not work on Tuesday or Wednesday, but he worked the following Thursday and Friday and until about 11 a. m. on Saturday, when the witness took him home because he continued to complain; and that he did not work thereafter.
George D. Swope testified that he had known Kerby for many years and he appeared to be in good health prior to April 26, 1946.
Dr. W. E. Walker, a physician at La Monte, Missouri was called as a witness for claimant. As indicated above, the employee first consulted this doctor on April 29, 1946, three days after the accident. Dr. Walker testified that he "saw Mr. Kerby 677 days, he was sick 782 days." When Kerby came to his office on April 29, he complained of soreness and pain in the umbilical region, but did not mention any accidental injury. The doctor concluded that he was suffering from an intestinal ailment and gave him some medicine. On May 2, he found "more soreness, tense across the umbilical region, some more or less pain up to the bottom of the ribs." The doctor stated that he "gave the heart a thorough going over" and "couldn't detect anything with the ear or stethoscope," *467 but admitted that some heart ailments cannot be detected "with the ear." About the same time (the exact date is not indicated), Kerby told him about "catching the big rock and about getting it into the truck." The doctor then concluded that the patient had received a blow in the umbilical region which resulted in an injury to "the dorsal ganglia of the sympathetic nerve center." He stated that such an injury could cause almost any condition, including heart trouble. This witness stated that on or about January 11, 1948, he discovered Kerby was suffering from "what we call a potential hernia" in the umbilical region. He concluded from the appearance of the potential hernia that it was caused by the alleged accident and this, he said, confirmed his theory that Kerby received a blow which injured the nerve mentioned above.
Dr. Walker further testified that Kerby did not have "any clot," nor did he have "a coronary occlusion, but he did have a spasmodic coronary contraction. * * * The sympathetic nerve system absolutely controls circulation, digestion, secretion and excretion, and the ganglia here was injured; * * * that would bring on heart, kidney, liver trouble and so forth, anything that interfered with circulation will affect you anywhere. He had them all," and that in his opinion "this slab falling that distance could cause that trouble." He said the immediate cause of death was myocardiac degeneration, meaning a degeneration of the heart muscles to the point where the heart ceased to function, and stated: "Q. What in your opinion caused this heart condition? A. To make a long story short, I think the injury was the cause of Mr. Kerby's death. Q. Assuming Mr. Kerby had hardening of the arteries and sustained that blow, * * * what effect would that have on his heart? A. It would aggravate it."
Dr. Walker testified on cross-examination that his conclusions regarding the cause of Kerby's death were all predicated upon the assumption that he received a blow in the umbilical region, although "a strain or effort could produce the same thing. * * * This heart business angina businessinterference with coronary circulation"; that "this same condition" could not have been produced by arteriosclerosis, but "it was caused by an injury to this nerve business; * * * primarily, that was the cause of all his trouble; and that "if the rock did not strike him in the umbilical region of the abdomen, then there would have been and could have been no injury to that nerve." He stated that he was not very familiar with arteriosclerosis, having had only two cases in his 45 years of practice; that he knew the electrocardiograph was an accepted means of diagnosing heart ailments, but had never used one.
Kerby was taken to Research Clinic in Kansas City on June 9, 1946, and he entered Research Hospital on June 12, 1946. As indicated above, he remained there for about six weeks under the care of Dr. Robert C. Davis and Dr. William F. Saunders. The depositions of these doctors were taken by defendants on August 25, 1947, and their testimony in this form was introduced by defendants on the hearing. Dr. Davis testified that he first examined Kerby on June 12, 1946, at which time his trouble was diagnosed as coronary occlusion; that such diagnosis was confirmed by electrocardiograms and blood tests showing an increased sedimentation rate; that Kerby gave him no history of any accident; that "a person may suffer coronary occlusion in almost any state of physical exertion without being in any way connected with trauma"; that "constant exertion throws a little more strain on the heart," but "it may also come on at any time"; that a blow of the type described could not have injured the heart or coronary artery, and could not have caused the occlusion from which Kerby was suffering.
Dr. Davis testified on cross-examination that if Kerby "did exert himself a little more than usual" at the time in question it is "just a questionable matter as to whether or not you get an occlusion from the actual exercise itself at the time of it. You may get it at a later date," and continued:
*468 "Q. You wouldn't say this exertion didn't cause it? A. Oh, I wouldn't say it didn't cause it.
"Q. And you wouldn't say that this blow would not have caused it? A. I can state positively there wasn't sufficient blow to the chest to do that. * * *
"Q. Would it have any effect or contribute to it? A. Nothing, only just additional exertion.
"Q. But the mere fact that it took place on this particular occasion when a man was at workdoesn't that indicate that it must have had something to do with it? A. No, sir. The coronary occlusion takes place as the result of a long standing progressive disease.
"Q. Does it come on all at once without even previous disease? A. No, sir, neither did this one. * * * It is a gradual narrowing of the artery and the stream of blood that goes through it is finally blocked off. They have the story that an exertion or sometimes without exertion they have pain and they are all right for awhile, but finally it comes to a point where it is blocked off and they have pain that was just like this man's that lasted for three hours on June 9, 1946. * * * It is a typical case of coronary occlusion starting June 3rd (1946) and finally terminating with coronary occlusion on June 9th (1946)." * * * He further testified: "If the man had reported that he had an accident and a sudden severe strain or something like that, you have to take those things into consideration, sure. I don't dogmatically say exertion doesn't have something to do with it."
He testified on re-direct examination: "Q. Dr. Davis, if undue exertion, physical exertion brings on coronary occlusion, how soon following the undue physical exertion would the coronary occlusion manifest itself? A. Usually within a few hoursnot later than 24 hours."
Another deposition of Dr. Davis was taken by the defendant herein on November 9, 1948, after Dr. Walker had testified at the hearing that in his opinion the umbilical hernia which appeared in January of 1948 was caused by the alleged accident, and that this confirmed his theory that Kerby had received a blow which injured a nerve controlling the functions of the heart. This deposition was made a part of the record by agreement of the parties. In such deposition, Dr. Davis testified that "we have had patients who had a strain that produced a coronary," but in Kerby's case there was no connection between the coronary occlusion and any accident that occurred in April, 1946; that the occlusion was acute when he saw Kerby on June 12, 1946, and "it couldn't have been going on a month"; that "we can say that by the changes that took place in the electrocardiogram, or serial eloctrocardiogram, from day to day, and by the sedimentation rate"; that a coronary occlusion could only result from trauma where the trauma was so severe that it injured "the heart through the ribs, the chest wall, and the pericardium and "it takes a terrible blow to do it"; that there is no nerve located in the front part of the body, either in the chest or in the abdomen, which has any connection with the functioning of the heart, and that his "findings indicated positively the presence of a coronary occlusion, which would be something entirely different from any nerve involvement." Dr. Davis further testified that he and Dr. Saunders examined Kerby's abdomen; that "we weren't too interested in the abdomen, because he had this coronary occlusion and we might have overlooked it. * * * He could have had it and we could have overlooked it"; that "umbilical hernias do appear without trauma," and "more of them appear without trauma than with trauma."
The deposition of Dr. William F. Saunders was introduced in evidence by the defendants. Dr. Saunders testified that when he first saw Kerby at Research Clinic on June 11, 1946, the patient stated that he was feeling well until June 3, 1946, when he had a sudden and severe attack of pain in the upper epigastrium lasting about five minutes; that he said this attack was followed by similar attacks during the next few days, and by a severe attack lasting three hours on June 9th; that Kerby did not mention any accident; that at the time of his examination, *469 Kerby was suffering from acute coronary occlusion which is a sudden shutting off of the blood supply of a branch of the coronary artery supplying blood to the heart muscle, and is caused by a small blood clot which develops as a result of arteriosclerosis; that "any patient that has a coronary thrombosis has a period of time before they develop the actual thrombosis," and "during that time any exertion would cause pain from coronary insufficiency"; that the occlusion might come on later, "but it is not necessarily related to any particular exertion unless it was a direct trauma"; that there was "no evidence of sufficient trauma to produce that occlusion"; that "you have to take into consideration that any exertion puts more of a strain on the heart," and is "more likely to cause an occlusionat that particular time," but in his opinion the alleged accident did not cause the occlusion from which Kerby was suffering.
All of the foregoing evidence was admitted without objection.
Claimant asserts that the award denying compensation is not supported by competent and substantial evidence but is, on the contrary, against the overwhelming weight of the evidence. In our review, we must determine whether the commission could reasonably have made its finding and reached its result upon consideration of the whole record; and we should set aside the award if it is clearly contrary to the overwhelming weight of the evidence. Wood v. Wagner Electric Co., 355 Mo. 670, 674, 197 S.W.2d 647, 649; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 1166, 200 S.W.2d 55, 62; Karch v. Empire Dist. Electric Co., 358 Mo. 1062, 1069, 218 S.W.2d 765, 769.
The burden was on claimant to show not only that her husband suffered an accidental injury arising out of and in the course of his employment, but that his death resulted from such injury. Karch v. Empire Dist. Electric Co., supra; Ulman v. Chevrolet-St. Louis Division of General Motors Corp., 349 Mo. 906, 163 S.W.2d 778; DeLille v. Holton-Seelye Co., 334 Mo. 464, 66 S.W.2d 834. Section 287.120, R.S.Mo. 1949, Mo.R.S.A. § 3691, provides, that the employer shall be liable irrespective of negligence, to furnish compensation "for personal injury or death of the employee by accident arising out of and in the course of his employment"; and Section 287.020, R.S.Mo.1949, Mo.R.S.A. § 3695(b), provides that the word "accident" shall be "construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury", and that "the term `injury' and `personal injuries' shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom." The "event" referred to in this section is not the result but that which produced the result. State ex rel. Hussmann-Ligonier Co. v. Hughes, 348 Mo. 319, 153 S.W.2d 40; Killian v. Sterling Aluminum Products Co., Mo.App., 227 S.W.2d 526.
It is appearent that the evidence regarding the cause of Kerby's death is conflicting. He entered Research Hospital on June 12, 1946. As stated, Dr. Davis and Dr. Saunders testified that when Kerby first came under their observation he was suffering from an acute coronary occlusion; and that in their opinion this condition was not caused by trauma or exertion in connection with his work on April 26, 1946, but was the result of a long-standing, progressive disease known as arteriosclerosis. Dr. Davis testified that where an occlusion is brought about by undue exertion it will develop within 24 hours after such exertion; and that it would have been impossible for the condition which he found at the time of his examination on June 12, 1946, to have existed since April 26. Dr. Saunders said that the electrocardiograms did not indicate any previous infraction of the heart muscle. Both doctors testified that trauma does not cause a coronary occlusion except in cases where a crushing blow to the chest is involved with direct trauma to the heart, and that Kerby's condition on June 12, 1946, was not caused by trauma.
Counsel for claimant lay great stress upon certain statements made by the two *470 doctors such as the statement of Dr. Davis, "I don't dogmatically say exertion doesn't have something to do with it. * * * We have to take those things into consideration." Often the segregated answer of a witness, standing alone and unexplained, leaves a false impression. Both doctors explained that as arteriosclerosis develops the coronary artery, without becoming completely blocked, may become so obstructed that an insufficient amount of blood is supplied to the heart muscle, such condition being referred to as coronary insufficiency; that when this happens any exertion will cause pain in the region of the heart, but the person so affected may experience such pain without any exertion being involved. It was in this connection that the doctors made the statements referred to. These statements, when read in connection with all the testimony, are not inconsistent with the conclusions of the doctors.
Dr. Walker, a witness for claimant, stated that Kerby's condition was not due to arteriosclerosis and that he did not have a coronary occlusion. It was his theory that Kerby sustained a blow to the abdomen which injured "the ganglia of the sympathetic nerve," which brought about a heart condition which he referred to as "a spasmodic coronary contraction," the immediate cause of death being myocardiac degeneration. It was his opinion that the injury mentioned was the cause of Kerby's disability and death. He admitted, however, that his opinion was based upon the assumption that Kerby sustained a blow to the abdomen which injured the nerve described. Dr. Davis testified that there is no nerve in the umbilical region or in the front of the chest which has any connection with the functioning of the heart. Furthermore, Kerby testified that he caught the piece of concrete between his chest and the bed of the truck.
The conflict in the medical testimony made an issue for the commission to decide. Driemeyer v. Anheuser-Busch, Inc., Mo.App. 153 S.W.2d 821. Defendants' expert witnesses based their opinions upon examination and treatment of the employee and upon material facts in evidence. Their testimony was competent and substantial evidence from which the commission could reasonably have found that the employee's death was not caused by trauma or physical exertion in connection with his work and did not result from any accident while he was so engaged on April 26, 1946. Jones v. Remington Arms Co., Mo.App., 209 S.W.2d 156.
Claimant relies heavily upon the case of Cheek v. Durasteel Co., Mo.App., 209 S.W.2d 548. The Cheek case has many distinguishing features from this case but, without pointing them out in detail, it is sufficient to say that all the medical testimony in that case is favorable to the employee. That is not the situation in the present case. Other cases cited by claimant have been carefully examined and found not to be in point because ruled upon entirely different factual situations.
From a careful consideration of the record, we have reached the conclusion that the award of the commission, denying compensation, is based upon competent and substantial evidence; and that the finding and award are not contrary to the overwhelming weight of the evidence. The judgment of the circuit court should be affirmed.
SPERRY, C., concurs.
PER CURIAM.
The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is affirmed.
All concur.