ELLEN WICKS AND OTHERS v. NORTHLAND MILK & ICE CREAM COMPANY.[1]

December 4, 1931.

No. 28,598.

[1]Reported in 239 N. W. 614.

*Rockwood & Mitchell* and *B. A. French,* for relator.
*Peters & Gilbert,* for respondents.

HILTON, J.

Certiorari to review a decision of the industrial commission awarding compensation under the workmen's compensation act to the surviving widow of Joseph F. Wicks, who died while in the employ of the Northland Milk & Ice Cream Company. The award was for the benefit of the widow and two minor children. The referee denied compensation. On appeal, by a two to one vote, the commission reversed the referee and made the award. The question involved is whether Wicks' death resulted from an accidental injury to his person arising out of and in the course of his employment.

The deceased employe was 39 years of age. For upwards of ten years prior to his death he had worked half of his time for the Northern Pacific Railway Company as a locomotive fireman and the other half for the employer-relator here. As a fireman for the railway company Wicks had acquired seniority rights and retained them while temporarily laid off from duty at intervals of approximately six months; during those periods he worked as a milk wagon driver for relator. He last worked for the railway company on February 12, 1930. For 26 days thereafter he was out of employment and then commenced working for relator. He had apparently been well and healthy during his whole life; never required the services of a physician; never had fainting spells or other known ailment. Wicks was a willing and good worker and also a speedy one, putting all his energy into his work. On occasions he would become much excited at small provocation.

Upon resuming his employment with relator, he was assigned to a route that was new to him and spent the first two days in

familiarizing himself with it. He then worked it for six days, taking the next day off as his rest day, going back to his work on the morning of the eighth day (March 21, 1930). The route was one that had "run down," many customers having been lost because of the inefficiency of the former driver. Wicks' job, in addition to delivering products of relator to customers, was to solicit and build up the trade. That work was trying and gave him much concern.

On the morning of March 21 Wicks arose at five o'clock, dressed warmly, and ate a fairly heavy breakfast. Because of the delay of a fellow employe who was to take him to relator's place of business, Wicks was distressed for fear he would not reach his place of work in time. On arrival at the barns of relator he harnessed his team, watered the horses, hitched them to his wagon, and drove three and a half blocks to relator's creamery, where he was to load. In performing that duty, on the morning in question, Wicks was required hurriedly to place 23 crates of filled quart milk bottles into his wagon from the side thereof. These crates were 12 inches high, 14 inches wide, and 18¼ inches long, with iron lugs at the corners, and each held 12 filled quart bottles of milk. Each crate thus filled weighed about 70 pounds. Two crates were handled at a time, thus making a weight of about 140 pounds.

Because there were wagons behind him to be loaded, Wicks was required to work speedily; on that morning he worked faster than usual. Much lifting and shoving of the crates was necessary; the work was strenuous; loading was the heaviest work the drivers were required to perform. There was considerable noise and confusion; each driver was anxious to get out on his route as soon as possible.

In placing the crates in the back end of the wagon Wicks was required to work in a stooping position. He was thus hurriedly at work for about three minutes; his team moved ahead a short distance and stopped before the wagon arrived at the next loading window, where crates of pint bottles of milk were to be taken, thereby preventing the next wagon from reaching the vacated quart

bottle loading window. On investigation Wicks was found lying partly on the floor of his wagon and against the crates; his face was "pale"; he did not speak and could only moan; he arose slowly from his reclining position, reached for the reins suspended overhead and then collapsed, falling to the floor. He was carried a distance of from 40 to 50 feet, relaxed and showing no strength, his arms dangling by his sides. He took a couple of deep breaths, opened his eyes for a few seconds, gave a slight moan and died, within eight or ten minutes after being found in the wagon.

An autopsy was held, from which it appeared that Wicks was a well developed and nourished man, approximately five feet seven or eight inches in height and weighing about 160 pounds. His organs were normal in all respects, his heart weighing 350 grams; the myocardium was firm and no changes noted in the valves; there was no cardiac decompensation or coronary thrombosis; however "the anterior descending branch of the left coronary shows marked intimal thickening and in a few areas is almost completely closed. The right coronary also shows a marked intimal thickening and is almost completely closed in one area." The heart was not enlarged or dilated.

Five physicians, all eminent in the medical profession, testified as experts. None of them had ever seen Wicks alive. The conditions revealed by the autopsy were not in dispute, and each of the doctors used the autopsy report in forming his opinion. The two doctors who performed the autopsy were in no better position in that regard than were the others.

Relator's experts were of the opinion that death resulted from coronary sclerosis, one stating that in his opinion the work that Wicks was doing that morning "had little or no bearing upon the case." Another stated his opinion to be that such work "had no important bearing on his death." On the other hand, experts for respondent testified that the severe strain and muscular exertion involved on the part of the deceased in loading his wagon that morning, combined with his emotional and mental strain, overtaxed his diseased heart and initiated an attack of angina pectoris, resulting

in death. With this coronary sclerosis he might have lived for years.

The testimony of the experts on both sides was lengthy and learned. Direct evidence was given, and hypothetical questions embodying the autopsy findings and other proved facts were asked; each witness evidenced a complete grasp of all the evidentiary facts and gave particularly clear reasons for the conclusions drawn therefrom. A detailed resumé thereof will serve no useful purpose.

There was a clear conflict in the opinions expressed; such a conflict that different persons might reasonably draw different conclusions therefrom. The industrial commission was the trier of fact. Under the familiar rule maintaining in such a situation, the findings of the commission, having sufficient support in the evidence, must be sustained. 1 Dunnell, Minn. Dig. (2 ed. & Supp.) § 411.

A review of the numerous cases cited by the respective counsel is not necessary. An award should be made when the evidence shows that there was an accidental injury to the person of the employe arising out of and in the course of his employment. Each of these cases was determined upon the facts therein; if the determination of the trier of fact had adequate support in the evidence, there was an affirmance, otherwise not. A careful consideration of the entire record convinces us that the award here was proper. There was an "accidental injury"; an aggravation of an existing infirmity occurring in the course of Wicks' employment; his sudden death was caused thereby. Within the decisions of this court the injury was compensable. 6 Dunnell, Minn. Dig. (2 ed. & Supp.) §§ 10396, 10397, and cases cited; Reardon v. City of Austin, 174 Minn. 359, 219 N. W. 292.

An attorney's fee of $100 is allowed in this court.

Affirmed.