## CAROLINE KEMLING v. ARMOUR & COMPANY.[1]

November 1, 1946.

No. 34,261.

*G. P. Mahoney* and *John S. Morrison,* for relator.
*G. W. Mantor,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Certiorari upon the relation of Armour & Company, employer, to review the decision of the industrial commission awarding petitioner, Caroline Kemling, as widow of Herman Kemling, compensation for his death. The referee's findings, which were affirmed by the industrial commission, determined that on April 23, 1945, decedent, while employed by relator as a laborer, sustained an accidental injury arising out of and in the course of his employment which resulted in his death.

Relator contends that the death of Herman Kemling was not caused by an accident as defined by the workmen's compensation act. Minn. St. 1945, § 176.01, subd. 9.

[1]Reported in 24 N. W. (2d) 842.

Decedent was originally employed by relator as a laborer in its hog-dressing department. He worked in this department for over a year. About six weeks prior to his death, he was transferred to the beef-cut department and worked therein as a laborer until the day of his death, piling rounds, trucking out bones, and doing other similar tasks not regarded as heavy labor.

At seven o'clock a. m. on April 23, 1945, the day of his death, decedent reported for work in the beef-cut department to commence work on a new assignment designated as "beef dropper." This assignment required him to stand at the head of a "break-up table," which is approximately 3½ feet wide, 12 feet long, and 30 inches high. Attendant upon him in this work were five butchers designated as the "break-up gang." Decedent, as beef dropper, was required to keep the break-up gang steadily supplied with quarters of beef for butchering. His work was carried out as follows: As he stood at the head of the break-up table, the quarters of beef came to him by means of a trolley equipped with hooks from which the beef quarters were suspended. Using his hands, arms, and body, he disengaged and lifted each quarter of beef from its hook and placed it on the break-up table in position for the break-up gang to commence work. He was further required to pick up and turn over on the table all front beef quarters passing through his hands.

The run of beef on the morning in question consisted of heavy grade "three-way army beef," of much greater weight than an ordinary run of beef. The testimony of witnesses indicated that the weight of the quarters handled by decedent varied from 75 to 195 pounds for hind quarters and from 100 to 250 pounds for front quarters. On a run such as was involved on that morning, witnesses testified that decedent was required to drop from 200 to 240 quarters an hour.

The work of a beef dropper has additional difficulties inherent in it. Some of the beef quarters are slippery because of the presence of tallow on them, and as a result it is difficult to obtain a firm hold on them. Some become jammed too tightly on the hooks, and it is necessary to rock them back and forth by hand

to loosen them, or to take off the hook and carcass together and pry the hook out of the carcass. At times the trolley stalls, and it is necessary to pull the quarters some six or eight feet forward by hand.

The beef dropper is a pieceworker, his earnings being determined by the number of quarters he handles. Likewise, the five butchers comprising the break-up gang attendant upon him are paid on a piecework basis. In consequence, the beef dropper must work at a rapid rate so that the members of the break-up gang will not incur an income penalty.

Members of the break-up gang who observed decedent on the morning in question testified that he had difficulty from the start in handling the beef quarters properly. On several occasions it was necessary for members of the break-up gang to go to his assistance. One such witness testified to the following conversation with decedent:

"I told him the job was too heavy for him—that he couldn't handle that job. He answered me back he didn't want the job; it was too heavy for him, and I said, 'You darn fool, why don't you go into the office and tell the boss that you can't handle it?' I was kind of sore because we wasn't getting the beef."

Notwithstanding his difficulty with the work, decedent remained on the job until about 8:30, continuing during this time to delay the break-up gang because of his inexperience and inability to handle the quarters of beef properly. Witnesses testified that between 7:30 and 8:30 his appearance was that of a "hard-worked man," and that by 8:30 he appeared to be "all in." Sometime between 8:30 and 9:30 he stated to one of the attendant employes that he did not think he could handle the job, and left to see the foreman. When he arrived at the foreman's office he complained of a pain in his chest and appeared to be in distress. He was directed to go to the plant nurse. In doing so he again walked through the beef-cut department. His appearance then was described by a witness as follows:

"* * * his face was kind of sickly like—white or yellow, like a man about ready to faint, or something. I have seen persons faint and their face would turn white—that's the way his looked."

Other witnesses noticed his "wobbly gait" and asked him what the trouble was. He replied that he "had kind of a pain in his chest and he couldn't breathe very good." At the nurse's office his pulse rate was taken and he was given a glass of water and advised to lie down. A short time later the nurse found him choking, gave him an injection of adrenalin, and forced him to inhale amyl nitrite. She called a doctor and another nurse, but, before the doctor arrived and in spite of the nurses' administration of artificial respiration, he died at about 10:10 or 10:15 that morning.

Prior to this date and even on the morning thereof before decedent commenced work, his appearance and actions all were indicative of good health. Over the years, he had never been afflicted with illness, infirmity, shortness of breath, chest pains, or disabilities of a similar nature. At no time had he sought medical advice or undergone medical treatments, except on one occasion, when he was afflicted with a rash on his legs. He had previously passed four preëmployment medical examinations. All medical testimony indicated that he had not suffered from heart disease prior to the date of his death, although the autopsy disclosed that there was some evidence of changes in the coronary artery, moderate in degree and nondisabling. Two medical experts called by petitioner (whose testimony must be accepted as true under the rules governing review of decisions of the commission) testified as follows as to the cause of death:

Dr. Moses Barron:

"That the excessive strain immediately preceding the death, a strain resulting from the type of work that he was doing from 7 o'clock to 8:30, initiated the thrombus, resulting in his death."

Dr. (Major) Thomas Ziskin:

"The attack was brought on by the excessive strain of the work which he did that morning and which he was not accustomed to do."

It is relator's contention that the evidence above outlined is insufficient to establish an "accident" arising out of and in the course of employment as defined in § 176.01, subd. 9, which provides:

"The word 'accident,' as used in the phrases 'personal injuries due to accident' or 'injuries or death caused by accident,' means an unexpected or unforeseen event, happening suddenly and violently, with or without human fault, and producing at the time injury to the physical structure of the body, * * *."

We are of the opinion that the evidence is sufficient to sustain the findings and award of the industrial commission. The contention that, since death did not follow "an unexpected or unforeseen event, happening suddenly and violently," its cause could not be attributed to an accident within the statutory definition is contrary to our previous interpretations of the statute.

In Babich v. Oliver I. Min. Co. 157 Minn. 122, 127, 195 N. W. 784, 786, we stated:

"* * * If there is a causal connection between the work the employe is doing and the sudden and violent rupture, break or tear in the physical structure of his body, the injury comes within the definition of accidental even though there is nothing extraordinary occurring in or about the work itself * * *."

This rule is also expressed in Klika v. Independent School Dist. 161 Minn. 461, 464, 202 N. W. 30, 31, as follows:

"Finally, though the employe is predisposed to what is commonly called a rupture, though there is a lack of physical integrity of the parts so that a rupture is likely to result some time, though he has a congenital or acquired condition favorable to its development, if an unusual strain or overexertion attendant upon the work induces its development, that is the legal cause and the result is compensable."

And further, in Caddy v. R. Maturi & Co. 217 Minn. 207, 213, 14 N. W. (2d) 393, 396:

"If the evidence here ultimately establishes that relator possessed a weakened bodily structure resulting from his employment and

that on some particular occasion an unusual strain or overexertion caused a disk in his back to slip out of place, then any subsequent disability resulting therefrom would be covered by the compensation act."

In Hiber v. City of St. Paul, 219 Minn. 87, 16 N. W. (2d) 878, we had occasion to consider a case somewhat similar to the instant one. There the employe, although suffering from coronary sclerosis, had been working regularly as a fireman. On one occasion, while engaged in extinguishing a fire, he was subjected to extreme exertion and excitement. A severe heart attack followed, which permanently disabled him from performing his work as a fireman. There, as here, it was contended that the evidence did not disclose that the employe had sustained an accidental injury, but, rather, that his disability was due to overwork and strain placed upon a previously disabled heart. In upholding the commission's award to the employe, we stated (219 Minn. 91, 16 N. W. [2d] 880):

"* * * Here, the extreme exertion and excitement in connection with the occurrences mentioned were sudden, extraneous events producing, according to the employe's medical testimony, the unforeseen result of injury to his heart muscles. Consequently, as we held in Brown v. Minneapolis Bd. of Fire Underwriters, 210 Minn. 529, 299 N. W. 14, which in its essential facts is the same as the instant case and controls decision here, *injury to an employe's heart muscles caused by exertion and excitement greater than is usual and customary in the performance of his duties is an accidental injury within the meaning of the compensation act.*" (Italics supplied.)

In the Brown case, cited above, we again upheld a finding of accidental injury where a heart attack followed unusual exertion on the part of an employe. There, on the occasion of a fire at the Dyckman Hotel in Minneapolis, the employe, in connection with his work, hurriedly climbed three flights of stairs while carrying heavy tarpaulins and partially collapsed upon reaching the fourth floor. This court stated (210 Minn. 531, 299 N. W. 15):

"* * * expert medical opinion was given to show that the Dyck-man Hotel incident played a great part in bringing about the present condition of employe. Other evidence tended to prove that while the crews often carried tarpaulins it was unusual and out of the ordinary to carry them up such great numbers of steps. Here, then, was a sudden, extraneous event directly producing an injury to the physical structure of employe's body. The undue effort exerted in hurrying up the stairs caused a rapid increase in the decompensation of his heart. The medical expert for the employe testified that the added strain caused damage to the heart muscle. This unforeseen result, which created employe's present condition, was directly and immediately caused by the excessive and unusual strain. Exertion as an element of causation has been recognized by this court as a basis of compensation. * * * *Injury due to strain which is of a greater degree than that usual and customary in the scope of employment is an accidental injury within the terms of the act.*" (Italics supplied.)

Based upon the foregoing authorities, there is ample evidence in the instant case to sustain the commission's determination that decedent's death followed an accident arising out of and in the course of his employment. Here, the record is undisputed that the severe and unusual strain placed upon decedent in his new assignment in the rapid handling of numerous heavy beef quarters, just prior to his death, initiated the thrombus and damage to his heart which resulted in his death, and hence, under the above decisions, that death was due to an accident arising out of and in the course of employment.

While it is true that there was some evidence of prior damage to decedent's coronary artery, this in itself, under numerous decisions of this court, would not eliminate the right to compensation for accidental death brought about by overexertion resulting in coronary thrombosis. As stated in Walker v. Minnesota Steel Co. 167 Minn. 475, 476, 477, 209 N. W. 635, 636:

"The compensation act was designed for the protection of all laborers coming within its purview. That is, it does not apply to

those only who are strong in body. Neither is it limited to those only who are normal. Those who are below normal, have a weakness or a disease, are also within its protection. Compensation is not dependent upon any implied assumption of perfect health. It does not exclude the weak or physically unfortunate. * * *

\* \* \* \* \*

"An actual aggravation of an existing infirmity caused by an accident in the course of employment is compensable, even though the accident would have caused no injury to a normal person."

See, also, Haller v. Northern Pump Co. 214 Minn. 404, 8 N. W. (2d) 464.

Relator cites Stanton v. Minneapolis St. Ry. Co. 195 Minn. 457, 263 N. W. 433, in support of its contention that there is no evidence of an accident here. In Brown v. Minneapolis Bd. of Fire Underwriters, 210 Minn. 529, 299 N. W. 14, *supra,* this court pointed out that in the Stanton case there was no evidence of unusual exertion as the cause of death, and hence nothing in the record to sustain a finding of accidental injury. The exact opposite is true in the instant case.

For further authorities sustaining petitioner's position and which are nearly parallel to the situation here involved, see, Wicks v. Northland Milk & Ice Cream Co. 184 Minn. 540, 239 N. W. 614; Roos v. City of Mankato, 199 Minn. 284, 271 N. W. 582; Farrell v. M. C. Ragatz & Sons Co. 189 Minn. 573, 250 N. W. 454; Bacher v. Herschkowitz Bros. 245 App. Div. 876, 282 N. Y. S. 172; Moore v. Summers Drug Co. 206 N. C. 711, 175 S. E. 96; Industrial Comm. v. Smith, 45 Ohio App. 362, 187 N. E. 129; Smith v. Dept. of Labor and Industries, 179 Wash. 501, 38 P. (2d) 212; Bernstein Furniture Co. v. Kelly, 114 N. J. L. 500, 177 A. 554; Fire Commrs. v. Morris, 12 N. J. Misc. 153, 170 A. 221; Horovitz, Workmen's Compensation, pp. 88-89. See, also, Ogren v. City of Duluth, 219 Minn. 555, 18 N. W. (2d) 535.

The writ is discharged and the order of the commission affirmed. Petitioner may tax $250 attorneys' fees in addition to statutory costs.