## MABEL SIMON v. VILLAGE OF PLAINVIEW AND ANOTHER.[1]

June 13, 1952.

No. 35,736.

[1]Reported in 54 N. W. (2d) 32.

*Schacht & Schacht,* for relators.
*Burkhardt & Dunlap,* for respondent.

LORING, CHIEF JUSTICE.

This is a workmen's compensation case in which the widow and dependent children of a deceased employe, Lester Simon, hereinafter referred to as employe, were granted compensation by a referee, whose decision was affirmed by the industrial commission.

The question presented for decision is whether the employe's death was caused by an accidental injury arising out of and in the course of his employment. Incidental to this question is the one whether the work employe was doing on March 2, 1950, when he suffered a coronary occlusion, subjected him to unusually severe exertion and strain which resulted in his death. The referee found and the commission affirmed the finding:

"That on said date said employe suffered an accidental injury arising out of and in the course of said employment."

Does the evidence sustain this finding? It is not our function, as it is that of the commission, to retry the case on appeal. We are concerned only with the question whether there is evidence to sustain the finding of the commission.

There is no evidence in the record that employe prior to the occlusion, which ultimately caused his death, had any history or diagnosis of arteriosclerosis. However, all the doctors who testified agreed (at least there was no contrary statement) that in their opinion employe must have had sclerosis. The conclusion that there was a prior sclerotic condition is the result of a process of deductive reasoning from the fact of an occlusion itself.

Employe was about 45 years old at the time of his death. He was superintendent of the street and water department of the village of Plainview; in fact, he was the only one in the department. His

duties involved repairing water leaks, installation of water service, street work, maintenance, and reading of meters. On the morning of March 2, 1950, employe was directed to assist the sewer department in digging up a plugged sewer in front of a residence on a knoll in the southwest corner of the village. There was a strong northwest wind blowing that morning, and the place where the men were at work was unprotected. The temperature was zero or below, and the ground was frozen. When employe started work—and all that morning—he was accompanied by two men. They used a gasoline-driven hammer, commonly called a jackhammer, which is similar to a pneumatic hammer. This hammer was about four feet high and weighed 110 pounds. It was started with a pull rope, like an outboard motor. The three men alternated in the use of the hammer. Each would work from 10 to 15 minutes at a time. The superintendent of the sewage disposal plant testified:

"Well, one of them would be taking out the frozen stuff after breaking it loose, shovel it out, and the other man would be probably resting. *There isn't a living man who can run the hammer any length of time and stand up at it.*" (Italics supplied.)

To start it, the hammer is held upright with the left hand and the rope pulled with the right. The men had trouble with the machine that morning. It would run awhile and stop, and they had to start it "a lot." The men worked at the digging until noon and then went home for lunch. After lunch, one of employe's companions did not return. Employe and the other man were back on the job about 1:15 p. m. The hammer did not work, so, after repeated attempts to start it, employe and his companion took the machine to the pump house and repaired it. After it was repaired, they returned to the scene of their work, where employe used the hammer for 10 to 15 minutes. His companion used it about 10 minutes, and employe used it for another 10 to 15 minutes. His companion testified that employe had operated the machine for 25 minutes out of half an hour, with the rest as indicated above. After using it the last time, employe complained that he did not feel

"good." He sat in the cab of a truck for a while and then was driven to the pump house. During this time he complained of being sick and of a tightness in his chest. He looked white and sick. After sitting in the pump house, while his companion sought someone to drive him home, employe walked home. He arrived home about 5:30 p. m. very ill. A doctor was called and gave him a nitroglycerine pill and a morphine injection. He was taken to the hospital on the morning of March 4, where he stayed until March 21. He then remained in bed at home for three weeks and gradually was allowed to be up more and more. Toward the last of April, he was able to be up during the entire day and finally could help a little around the house and do a little work in the garden.

July 2 his daughter was mowing a neighbor's lawn. Employe pushed the mower about two to three feet when his wife made him stop. He then sat on the sidewalk in front of the house for 5 or 10 minutes, watching his wife and daughter cut the lawn. At about 6:30 he became ill. A doctor was called, but employe died shortly after his arrival. The death certificate, signed by Dr. D. G. Mahle, stated that the disease or condition leading directly to death was coronary occlusion, and it states:

"ANTECEDENT CAUSES
Morbid conditions,          Due
if any, giving rise         to (b) Coronary Sclerosis
to the above                10 Mo. plus."
cause * * *.

The doctors agreed that employe suffered a coronary occlusion on March 2 and another on July 2, which led to his death.

■ The principal question for decision is whether the work in which employe was engaged on March 2, 1950, was so unusually severe and strenuous as to support a finding, implicit in that of the commission, that the severe character of the work induced the occlusion which ultimately resulted in his death on July 2, 1950, so that it amounted to an accidental injury arising out of and in the course of his employment within the definition of such an injury as heretofore determined by this court.

This question involves subordinate questions as follows:

(a) Was there a causal connection between the first and second occlusions?

(b) Was there a causal connection between the occlusions and the work which employe was doing?

(c) Was the work employe was doing on March 2 unusually severe and strenuous for his occupation so that it might be determined that its unusual severity initiated the occlusion on that date?

(a) Dr. Mahle testified:

"Well, my opinion is that because once a person experiences a coronary occlusion he is many times more liable to experience another one; that this original exertion and the following coronary occlusion had a definite relationship to the final coronary occlusion."

Dr. James Charles Mankey testified:

"Well, it follows that once a man has had a coronary occlusion he is more liable or more susceptible to recurrent episodes or complications from such an occlusion."

Dr. Thomas Ziskin testified that in his opinion there was a causal connection between the first and second occlusions. We hold that the record sustains an affirmative answer to the first question and that there was causal connection between the first occlusion on March 2 and the one which occurred on July 2.

(b) Dr. Mahle testified that the cause of the first occlusion was the work that employe was doing that afternoon—the exertion under trying weather conditions. Dr. Mankey said:

"A. I think it is reasonable to assume that there is a relationship between the exertion put forth by this man's occupation on such a day. That there is definitely a relationship between his subsequent symptoms and his subsequent diagnosis as confirmed by hospital follow-up.

"Mr. Dunlap:

"Q. Then, Doctor, in direct answer as to whether in your opinion the work which this man did might or could have caused the coronary occlusion, is your answer yes?

"A. Yes."

Dr. Ziskin for the employe said that in his opinion employe's occlusion was due to the unusual stress and strain that day. He said:

"The main reason is the fact that I stated previously, about the hemorrhage occurring in the vessel wall of the coronary artery. These hemorrhages are the result of the unusual exertion which causes an increase in the pressure in these arteries, in the small arteries also, and causes them to break and result in hemorrhage into the vessel. Now, it takes an unusual exertion to do that. Evidence of hemorrhage in the vessel wall in studies that have been made have been found in about forty per cent of the cases where they have looked for hemorrhage in the vessel walls, they have found it pathologically. Another finding which was recently reported in experiments on blood clotting, it was shown that normal non-emotional individuals, the average clotting time of blood was 8.3 minutes. In an apprehensive group, the clotting time was reduced to 3.4 minutes. In those highly nervous or hysterical, the clotting time was reduced to 2.2 minutes. That shows the effect of emotion and strain and nervousness on the clotting time of the blood. It was reduced from 8.3 minutes to 2.2 minutes in the highly emotional, nervous types."

He said that a person is more liable to have such attacks in cold weather. It is also evident that in attributing the occlusion to the unusual exertion several of the doctors included the extra strain caused by the hammer's being out of repair and the strain and exertion of the efforts necessary to start it. We hold that the record supports an affirmative answer to question (b).

(c) Mr. Elmer Feldbrugge, with whom employe had been working the morning of the first occlusion, testified that employe had

used the gasoline hammer from time to time to dig up "Frozen ground, breaking up the sidewalk; anything that it was used for, it was meant for."

Dr. Mankey testified:

"Well, first of all was the exertion factor or so-called stress. He apparently put forth a little greater effort on this day than was customary in carrying out his duties as a worker. *This exertion was brought on by the mechanical defects or otherwise in operation of the hammer, plus the elements so far as the ground was concerned.* Another factor would be the cold itself. The incidence of coronary thrombosis precipitated in cold weather is quite significant, and this man worked hard and long and under zero weather, at least cold weather, all of which are factors in precipitating a coronary thrombosis in this example." (Italics supplied.)

In response to a question as to the cause of the occlusion, Dr. Ziskin said:

"Both physical and mental because of the fact that the pump or hammer wasn't working properly and his nervous tension and strain in trying to hold the hammer and pull the rope and having to take the hammer and try and get it fixed, and then come back and go through all the circumstances again with the hammer not working right. *Both the emotional and physical strain of that effort I would consider unusual.*" (Italics supplied.)

It is quite obvious that the record sustains an affirmative answer to the third question. These three questions being answered in the affirmative, the case falls squarely within the ruling of Kemling v. Armour & Co. 222 Minn. 397, 24 N. W. (2d) 842; Wicks v. Northland Milk & Ice Cream Co. 184 Minn. 540, 239 N. W. 614; Farrell v. M. C. Ragatz & Sons Co. 189 Minn. 573, 250 N. W. 454; but see, Gardner v. State Dept. of Highways, 199 Minn. 172, 271 N. W. 597.

We need not discuss the numerous cases cited by relators. It is sufficient that we find that there is sufficient evidence to support the commission's implied finding that the exertion which brought

on the occlusion on March 2 was unusual and that it was the cause of employe's death on July 2.

■ In connection with this last question, the court sustained an objection to a question asked employe's widow under the following circumstances: When Mrs. Simon finished her testimony on redirect examination the following took place:

"Mr. Schacht: No more questions.

"The Referee: I have no questions.

"(Off the record discussion.)

"Mr. Schacht: I want to ask Mrs. Simon one more question.

"Q. Mrs. Simon, were you at home on the 24th day of·March, 1950, when a Mr. Randall, representing the Hartford Accident and Indemnity Company, came to your home to talk with Mr. Simon and get a statement?

"A. Yes.

"Q. And were you present while the statement was being taken?

"A. Yes.

"Q. And you heard the conversation?

"A. Yes.

"Q. Between them at that time?

"A. Yes.

"Q. Did you hear your husband tell Mr. Randall that the work he was doing this day, referring to March 2nd, was not any heavier than any other work he had done?

"Mr. Dunlap: That's objected to as being improper cross examination. Further, that there's no foundation laid.

"The Referee: Sustained.

"Mr. Schacht: That's all."

Relators assign as error the referee's action in sustaining the objection. A careful examination of Mrs. Simon's testimony on direct and redirect examination discloses no testimony which would render this question proper cross-examination were the case being tried in court. We cannot reverse the commission for applying a rule which would have been applied in a court of law.

6 Dunnell, Dig. § 10321, states:

"When a witness has been examined, cross-examined, and dismissed from the stand, he can be recalled for further examination only by the indulgence of the court; and when permitted to be so recalled the court is entitled to exercise a large discretion as to the manner and the extent to which the favor granted shall be made use of."

The decision of the industrial commission is affirmed, and respondent, the petitioner below, is allowed $350 attorneys' fees in this court.

---

[1]Reported in 53 N. W. (2d) 814.