GENEVIEVE B. ERHOLTZ v. BALKAN MINING COMPANY
(PICKANDS MATHER & COMPANY, MANAGING AGENTS).[1]

June 3, 1955.

No. 36,567.

*Nye, Montague, Sullivan, Atmore & McMillan* and *Richard H. Hastings,* for relator.

*Paul J. Louisell,* for respondent.

KNUTSON, JUSTICE.

Certiorari to the industrial commission to review an award of compensation to dependents of a deceased employee.

John Erholtz was employed at the time of his death by Balkan Mining Company in the capacity of an oiler on a large electric shovel used by employer in its open pit mining operations. He had been employed by this company for a period of about 12 years, first on a track gang as a common laborer; then as a carpenter and brakeman and pitman; and for the last four or five years prior to his death as an oiler. In addition to his work for the mining company, employee operated a small farm on which he lived and did the usual work incident to farming operations. Employee was 50 years old, was five feet ten inches tall, and weighed about 180 pounds.

The shovel on which employee worked was a large machine weighing about 150 tons. Its power was derived from an electric cable

[1]Reported in 70 N. W. (2d) 863.

which ran to a switch house, the cable being about half a mile long. This cable consisted of copper wires covered by rubber and other insulation, the entire cable being slightly in excess of one and one-half inches in diameter and weighing one pound eleven and one-fourth ounces per lineal foot. As the shovel worked forward it was necessary to manually pull this cable in order to keep it from pulling out of its socket, and as the shovel moved in the direction of the cable it was necessary to pull it back in order to keep the shovel from running over it.

While there is dispute in the evidence, the commission could reasonably find that it was customary for several men to help pull the cable if it was to be moved any substantial distance. The number of men used for this purpose usually depended on how many were available and how far the cable had to be pulled, as well as the terrain over which it was to be moved. The pitman had the primary responsibility for moving and caring for the cables. Part of the duties of the oiler was to help pull the cable. Truck drivers also would help when they were available, the number of men used for that purpose varying from one or two, if the cable was to be moved a short distance, up to eight or ten, if it was to be moved any distance and particularly over bad ground.

Employee worked the night shift, starting at 11 p. m. On the night of August 21, 1952, he left home about 10 p. m. to go to work. His wife observed nothing to indicate that he was not in his usual good health. He reported for work at 11 p. m. The pitman usually present did not show up that night so the crew on the shovel consisted of the operator, Ernest Isaacson, an assistant foreman, Wilfred Risse, and Erholtz. The witnesses differ as to what the shovel was assigned to do that night. Isaacson testified that they were digging a drainage ditch some 20 or 25 feet wide and four to five feet deep at the bottom of the mine for the purpose of draining surface water into a sump, from which it could be pumped out of the mine. Samuel Kuchta, the mine engineer, and Risse testified that they were digging a cut for the purpose of casting up a pile of ore which could be loaded on trucks by the day crew. They claimed that the so-called

ditch was to be used by trucks as a roadway. The evidence is also in conflict as to the condition of the cut dug by the shovel. Isaacson testified that it was extremely muddy, the mud being 18 inches deep in places. Risse testified that the cut was solid and dry except for a small trickle of water running in the grooves made by the shovel teeth. Testimony of other witnesses corroborated both versions. The cut was estimated by some witnesses to be from 125 to 150 feet, and Isaacson estimated it to be from 400 to 500 feet in length. However, it may be assumed for the purposes of this decision that it was somewhere between 125 and 150 feet in length.

As the shovel moved in its operation, the cable that night was pulled by employee and the assistant foreman, Wilfred Risse. When they had completed the job, the shovel was moved back through the cut to the place where it was to be used by the day crew. In this operation, employee took hold of the cable about 30 feet from the shovel and Risse took hold of it about 50 feet farther from the shovel. They pulled the cable the length of the ditch in several operations. In doing so they would pull it until the slack became too great and the shovel then would stop so that they could dispose of the slack, when they would again resume the operation of pulling with the movement of the shovel. This operation took about 20 minutes. When they had completed moving the shovel and cable, Risse offered to give employee and Isaacson a ride out of the pit in his truck which was parked a short distance away. He started to walk toward his truck, but when he had gone about 50 feet he looked back and saw that employee had slumped to the ground, and about the same time Isaacson, who in the meantime had come down from the shovel and had noticed that employee was on the ground, yelled at Risse and he returned. Employee was then lying on the ground gasping for breath. Risse tried to revive him by artificial respiration, but he died without saying anything to anyone. Isaacson testified that about half a minute elapsed between the time that Risse addressed him and employee and the time when he saw employee lying on the ground. Risse, on the other hand, testified that about five minutes had elapsed between the time he last saw employee pulling the cable and when he saw him slumped to the ground.

An autopsy conducted by Dr. H. R. Irwin disclosed, among other things, that the left anterior descending coronary artery was completely occluded except for a small eccentrically placed lumen and that this lumen was completely filled by a soft red and yellow clot. All the doctors agreed that cause of death was heart failure due to myocardial infarction due to atherosclerotic occlusion of anterior descending branch of left coronary artery, coupled with the blood clot which completed the closing of the remaining lumen of the artery.

The referee awarded compensation to the dependents of employee. On appeal, the industrial commission affirmed by a divided decision.

The only question presented here is whether the evidence sustains a finding that employee died as the result of an accident arising out of and in the course of his employment.

We have so frequently stated the rules applicable to a determination of compensability under our workmen's compensation act where death or disability results from heart failure that it seems useless to again restate them.[2] We recently again had occasion to consider a case involving this question in Golob v. Buckingham Hotel, 244 Minn. 301, 69 N. W. (2d) 636. The facts in the case now before us are not distinguishable from those in many of our other cases in which we have upheld the commission's finding of compensability. As is usual in this type of case, we again have the same divergence of views among medical experts as to whether a coronary thrombosis can ever result from exertion as we have had in many previous cases. We have, in addition, the opinion of Dr. Irwin, who conducted the autopsy, that there was no causal relation between the exertion preceding death and the heart failure which caused the death, which opinion is based upon his conclusion that, if the exertion were to cause the formation of a blood clot and the resulting infarction, it would result in difficulty while the exertion continued and not after a lapse of five minutes. In this connection, however, we must bear

---

[2]See, for instance, Kemling v. Armour & Co. 222 Minn. 397, 24 N. W. (2d) 842; Simon v. Village of Plainview, 237 Minn. 136, 54 N. W. (2d) 32; and Stephen v. Miles Const. Co. 240 Minn. 307, 60 N. W. (2d) 801. Many of our cases are collected in these decisions.

in mind that there is other evidence in the record from which the commission could have found that the time elapsing between the end of the exertion and the collapse of employee was much shorter than five minutes.

A finding that the death of employee was caused by his work is amply sustained by the evidence. Whether the evidence sustains a finding that the exertion was something out of the ordinary or unusual when compared with his ordinary work so as to constitute an "accident," as we have defined that term in similar cases, is more questionable. However, if we accept the testimony of witnesses who said that the work was conducted under conditions of extremely muddy terrain and that the crew was shorthanded, which resulted in a much greater exertion than would be required ordinarily, the case comes within the rule which we have followed in many past cases. The employee had been checked semiannually by his family physician, Dr. H. A. Lamb, the last time about a year before his death. Aside from temporary high blood pressure, from which he recovered, Dr. Lamb never suspected that there was anything wrong with employee's heart. None of the men with whom he had worked ever noticed anything wrong nor did his wife know that he had any heart trouble.

From the autopsy it is difficult to escape the conclusion that employee's days were numbered because of the occlusion of his coronary artery, but that is not the test to be applied. The test, as we have said frequently in the past, is whether the unusual exertion to which he was subjected prior to his collapse precipitated his death so as to bring it about at a time when it would not have occurred normally. We believe that the evidence sufficiently sustains the commission's conclusion that the exertion here shown did so precipitate employee's death. As such, the findings of the commission must be sustained.

Petitioner is allowed $250 attorney's fees and costs and disbursements herein.

Affirmed.