## LOUISE ROOT v. CITY OF DULUTH AND ANOTHER.

76 N. W. (2d) 698.

May 4, 1956—No. 36,755.

*M. J. McKeon,* for relator.
*John M. Prins,* for respondents.

NELSON, JUSTICE.

Certiorari to review the order of the Industrial Commission denying petitioner compensation for the death of her husband, Theodore L. Root.

Root had been in the employ of the city of Duluth as a fireman for about 20 years at the time of the alleged accident October 31, 1949. On the evening of that day he was on duty as a member of crew No. 4 when it responded to a call to fill in at Headquarter's Station for crews that had left that station in response to an alarm. One of the duties of crew No. 4 while at Headquarter's Station was to replenish the hose used in response to the alarm. This hose was kept in the tower, a structure approximately 3 stories high. The tower was approximately 30 feet upward comprising 3 stories above the main floor, and it was necessary for him to ascend to the top by means of stairways as quickly as possible. Root went to the tower and then commenced to lower 52 sections of hose to the ground floor, each section being 150 feet in length. As the trucks returned from the alarm, Root helped drag off the used hose and load the trucks with fresh hose he had made available from the tower.

Dragging hose off the trucks and reloading fresh hose on the trucks was strenuous, hard work and had to be performed at somewhat high speed. Root complained at headquarters to the acting captain that:

"I don't feel just right. I feel kind of dopey."

The trip to Headquarter's Station had been an emergency run, but the trip back was not. Root rode on the side of the truck, hanging on to the railing. He had gone to headquarters on previous occasions and had performed the same type of work. The work of fighting fires was generally conceded as subjecting a fireman to greater strain than working at headquarters laying out hose.

On returning to the station he was sent out to turn off fire hydrants which evidently that night had been opened by Halloween pranksters. It appears from the testimony that he ran to one of the hydrants and that on his return there was something wrong with

him, and he was told not to run to those places, to take it easy. When he returned again, the testimony indicates that his face was gray, white, he was gasping for breath, and the captain in charge ordered him off the job. On this occasion he had gone up the hill to Third Street and 14th Avenue East to turn off a hydrant.

He was then taken by one of the firemen to his apartment, which was situated the first door east of the fire station. The petitioner, his widow, noted that at that time he was ashen white in color, had difficulty breathing, and was definitely in agony. She testified that his words were: "I just can't take it," and he started to cry. He remained at home continuously until November 29, 1949, on which date he was assigned regular duty as a fireman at Woodland Station No. 11 in the city of Duluth. He worked at that station continually as a fireman until August 7, 1950, when he was transferred to duty as a switchboard operator. The recording of this transfer in his employment record has the notation, "Heart Trouble."

Following the evening of the alleged accident of October 31, 1949, Root was seen by Dr. Emanuel the following day. Dr. Emanuel found that he had no pain or shortness of breath and advised him to take it easy.

Although Root had intermittently complained of chest pain and general discomfort, examinations by his family physician, Dr. Swenson, and his associate, Dr. Emanuel, disclosed that on November 1, 1949, he had been relieved of any pain and his examination was essentially the same at that time as it had been on October 17, 1949, two weeks prior to the evening of the alleged accidental injury due to unusual exertion. A careful examination of Dr. Swenson's testimony discloses that it makes no mention whatsoever of the previous evening's episode and at no time does Dr. Swenson comment on it or on having received a history of the alleged occurrence of the evening of October 31, 1949.

On November 7, 1949, it appears Root was again examined by Dr. Emanuel and "had been fairly well relieved, as far as his pain was concerned * * * but he was advised to stay off of work." He was again seen by Dr. Arnold O. Swenson, his family physician,

on November 25, 1949, when he was much improved, had little or no pain, and was advised he could return to work the following week.

On December 3, 1949, Dr. Swenson said the patient had no pain and that his heart had responded well to exercise. After January 23, 1950, he was not again seen by Dr. Swenson until the first of May 1950, at which time he had complained of slight attacks of precordial pain, of considerable heartburn, and of gastric distress. At that time a cardiogram was taken which, according to Dr. Swenson, showed no evidence of any heart damage or injury. On August 16, 1950, Dr. Swenson saw Mr. Root at his home. During these last mentioned periods, Root was on active duty as a fireman at the Woodland Station.

On April 1, 1951, Mr. Root apparently suffered a coronary occlusion of some severity and a very definite mild cardial infarction. He was hospitalized at midnight of April 1, 1951. The hospital history indicates that he had been suffering from angina pectoris for the past 7 or 8 years during which period he had used nitroglycerine and other medication. The evidence shows that the coronary occlusion which he suffered in April 1951, and which caused a very definite infarction of the heart, was sustained by him while he was at complete rest.

Mr. Root resigned from the fire department September 1, 1952, to accept a pension. He and his wife then moved to Florida. On November 21, 1952, during the same year, while he was seated on a bench watching some friends play shuffleboard and talking briefly with them, he died suddenly. In March 1953 his widow filed a claim petition for compensation alleging that her husband's death had been caused by an accident arising out of and in the course of his employment on October 31, 1949, and that he died as a result of said accident. No claim had been filed by the employee during his lifetime for workmen's compensation for the accidental injury now alleged as occurring October 31, 1949.

Hearings were held before the referee, and findings entered in favor of petitioner. The employer and its insurer appealed to the

Industrial Commission, which made independent findings and filed its order reversing the decision of the referee and denying compensation benefits by a majority decision, one of the commissioners dissenting.

It is clear from the testimony that employee had a history of angina pectoris, a form of pain associated with heart disease, dating back to 1943. At the hearing, the petitioner sought to prove two things. First, that the attack of October 31, 1949, was caused by heavy exertion not ordinarily incurred on the part of firemen in the performance of their duties, and second, that unusual exertion resulting in the attack of October 31, 1949, was the cause of, or a cause contributing partially to, Root's death on November 21, 1952.

The coworkers of Mr. Root who testified at the hearing said that the work performed by Root on the evening of October 31, 1949, was strenuous; but it also appears from their testimony that it was not considered an unusual exertion when compared to other duties of a fireman such as climbing ladders, fighting fires, and other duties that go with the job.

The medical testimony was in conflict. Conflicts in the expert testimony must ordinarily be resolved by the trier of fact. The medical testimony as to what caused the attack which Root suffered on October 31, 1949, was contradictory. The doctors testifying for the petitioner were of the opinion that Root's attack of October 31, 1949, caused heart damage that was at least one of the causative factors in Root's ultimate demise. Medical witnesses of employer and insurer, numbering among them well-known heart specialists, stated that the attack of October 31, 1949, was the result of a coronary insufficiency that caused no heart damage, and further that it was not, under all the circumstances as revealed by the testimony, a contributing factor in Root's death.

We cannot overlook certain facts here which present an entirely different situation from other heart cases which have been before this court where death occurred shortly after the exertion or within days or some weeks thereafter. Here we have a situation where the

decedent made no claim during his lifetime; his family physician disclosed no record of the history of this unusual exertion as being complained of, or related to him; he had suffered from angina pectoris since the year 1943; and his death did not occur until 3 years and 21 days after the alleged unusual exertion on the night of Halloween, 1949.

The case at bar comes under workmen's compensation statute, M. S. A. 1949, § 176.02, as it existed at the time of the incident relied on in the claim petition. Under that section it was necessary in a case of this nature to show some unusual exertion which caused the alleged accidental injury. Our statute has now been modified by L. 1953, c. 755, § 2. A reference to the modern trend away from a strict interpretation of the unusual exertion rule may be found in Golob v. Buckingham Hotel, 244 Minn. 301, 69 N. W. (2d) 636. A review of our cases on this subject may be found in Kemling v. Armour & Co. 222 Minn. 397, 24 N. W. (2d) 842. See, also, Stephen v. Miles Const. Co. 240 Minn. 307, 60 N. W. (2d) 801.

Many cases are to be found where it has been held that death resulting from heart trouble aggravated or accelerated by accident, though the decedent was predisposed thereto, is compensable. An aggravation of an existing disease or infirmity is compensable though the accident would not have caused the result in the case of a normal man. See, Walker v. Minnesota Steel Co. 167 Minn. 475, 209 N. W. 635, and cases therein cited.

With an existing heart condition dating back to 1943 diagnosed as angina pectoris; the administering of nitroglycerine in some form over the years; treatment by his family physician on October 17, 1949, followed by a coronary insufficiency on the evening of October 31, 1949, thereafter going back on regular duty November 29, 1949, and a cardiogram disclosing no heart injury on May 1, 1950, the argument is somewhat forceful that the occurrence of the evening of October 31, 1949, may well have been a coincidence and not a cause. Apparently the Industrial Commission so found. The referee found differently. The commission finds the facts. We are not able to say that the majority opinion involves a departure from

safe reasoning. They may well have reached their decision on the very definite facts expressed by a part of the medical men. Also the fact that Dr. Swenson's records disclosed no history of the occurrence; that no claim petition was ever filed during Root's lifetime; and that death occurred more than 3 years after the claimed incident of October 31, 1949, without presence of exertion, added decision problems clearly within the factfinding field.

We have consistently held to the view that a finding by the Industrial Commission upon a question of fact cannot be disturbed unless consideration of the evidence and the inferences permissible therefrom clearly requires minds to adopt a conclusion contrary to the one at which the commission arrived. Furlong v. Northwestern Casket Co. 190 Minn. 552, 252 N. W. 656; Jones v. Excelsior Laundry Co. 183 Minn. 531, 237 N. W. 419.[1]

It is not within our prerogative to say, upon the evidence submitted, that the commission could not as the factfinding tribunal reach the conclusion it did from a fair consideration of the evidence.

Affirmed.

---

[1]This rule applies though findings are concurred in by only a majority of the commissioners. See, Fahey v. Terp, 235 Minn. 432, 51 N. W. (2d) 273.