Joseph PARROTT, Employee (Plaintiff), Appellant,

v.

KISCO BOILER & ENGINEERING COMPANY (Employer), and The Fidelity and Casualty Company of New York (Insurer), (Defendants), Respondents.

No. 30276.

St. Louis Court of Appeals.

Missouri.

Feb. 16, 1960.

Fred R. Rodgers, St. Louis, for appellant.

Luke, Cunliff & Wilson, St. Louis, for respondent.

RUDDY, Judge.

This is an appeal by an employee in a proceeding under the Workmen's Compensation Law, Section 287.010 et seq. RSMo 1949, V.A.M.S., from a judgment of the Circuit Court affirming the award of the Industrial Commission denying compensation. The Referee of the Division of Workmen's Compensation and the Industrial Commission found that the employee had been fully compensated for a right inguinal hernia injury sustained by the employee and further found that the employee's heart condition was not caused, aggravated nor contributed to by either the accident of July 11, 1956, or the right inguinal hernia repair resulting therefrom.

It was alleged in employee's amended claim that "While claimant was unloading a steam boiler, weighing approximately 1800 pounds, he was caused to slip and drop back with said boiler, resulting in a hernia on the right side; that in connection with the necessary surgical repair thereof and hospitalization of claimant, he suffered additional disability and damage and abnormal function of his heart, resulting in disability to the man as a whole."

The employer and insurer denied that the employee sustained any disability, temporary or permanent, for which he had not theretofore received medical attention and compensation.

At the hearing before the Referee the attorney for the employee told the Referee that no claim was being made for the hernia and the medical costs for the surgical repair thereof, acknowledging that full compensation had been received therefor. He further told the Referee no contention was being made that the accident caused or aggravated the alleged heart condition. The sole claim made by the employee was that he sustained or aggravated a heart condition which resulted from the surgical repair of the hernia and the incidents surrounding the surgical operation. It was admitted by the employee that the surgical repair was successful insofar as the inguinal hernia was concerned.

Two of the points relied on by the employee raise the contention that there was not sufficient competent evidence to support the award in favor of the employer and insurer. If there was sufficient, competent evidence to support the award and it is not contrary to the overwhelming weight of the evidence, the employee's contention must be ruled against him and the award must be sustained. Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.W.2d 647; Williams v. International Shoe Co., Mo. App., 213 S.W.2d 657; Gonzales v. Johnston Foil Manufacturing Co., Mo.App., 305 S.W.2d 45. This contention requires a statement of the facts.

Employee was married and had been employed by the Kisco Boiler & Engineering Company for approximately ten years prior to July 11, 1956. His duties consisted of moving, disassembling and lining boilers which weighed from 350 to 3500 pounds. He said his work was hard but that he had no trouble performing his duties. He said the work took a lot of "strain and sweat." He worked steadily during the ten years of his employment, except for an occasional absence. His heart never bothered him and he was not nervous prior to the operation for the repair of the hernia.

On July 11, 1956, employee sustained an inguinal hernia on the right side while unloading a boiler off of a truck. He said he has not been able to work since the date of the injury. Between the date of the injury and the date he entered St. John's Hospital he had no difficulty with his breathing and had no unusual feelings in the left chest area. The only discomfort he experienced was pain in the area of his right groin. He made no complaints about his heart when he entered St. John's Hospital.

The day following his injury employee saw Dr. Zillgitt who told him he had a hernia and suggested employee see Dr. Demko, the company doctor. He was examined by Dr. Demko on July 13, 1956, and was told he had a hernia. He said Dr. Demko did not listen to his heart or take his blood pressure. The insurer then sent him to see Dr. Thomas Martin who examined him on July 19, 1956, and later he received a letter from the insurer instructing him to report to St. John's Hospital on July 31, 1956, for an operation. He reported at the hospital as instructed. When he entered St. John's Hospital he was interviewed by an internist who took his history and made an examination of his heart. His blood pressure was taken on the left arm and specimens of his urine and blood were taken for examination. He said he told the internist about having the flu in 1918, but did not recall telling him that after the flu in 1918 he "had an irregular rate or heart beat and high blood pressure." When asked on cross-examination if he denied that he made such a statement to the internist, he answered: "No, I don't remember if I did." Dr. Martin performed the operation on August 1, 1956. The employee remembered nothing about the operation. His first recollection, following the operation, was when someone was walking with him the evening of the operation. He said "they asked me how I felt and I told them there was like dots come before my eyes, as clear as I remember."

After the operation, while in the hospital, he could not "breathe regular," his heart beat faster and skipped beats and he could hardly walk. He said he complained about his heart to the nurses, attendants and Dr. Martin. However, on direct examination and again on cross-examination he said that from the time he entered the hospital until he saw Dr. Martin on August 14, he "didn't have any attacks of any kind." At another place in his testimony, in response to questions by the Referee, the employee said he felt pain in his left chest for the first time on the morning after the operation and noticed the shortness of breath when he tried to walk. He walked out of St. John's Hospital, with the aid of his wife, on August 8, when he was discharged.

In describing his condition after he left St. John's Hospital he said his heart continued to beat fast and that he continued to experience shortness of breath. It would bother his heart when he tried to walk. He said he had ringing noises in his head when he tried to walk and was nervous. In describing the actions of his heart, he said it "beats fast—there is a pause * * * or skip" and when it beats again "there is pain in there."

On August 14, 1956, employee was examined by Dr. Martin. He said he then told Dr. Martin his heart "was still bothering" him. Dr. Martin told him there was "a little miss in it" and advised him to see his family physician. He saw Drs. Webb and Zillgitt who had offices together. He was examined by Dr. Zillgitt and told to return. On the next visit Dr. Webb instructed him to enter the Bethesda Hospital. While in that hospital electrocardiograms were taken. He was confined to bed and remained in the hospital five weeks. After returning to his home he was confined to bed for six more weeks. Subsequently, employee was examined by Dr. John Hammond and had an electrocardiogram taken by Dr. Arthur E. Strauss.

James Richey testified that he was present when employee was injured. He said that

employee made no complaints about pain or shortness of breath prior to the accident and that he never noticed employee taking out time for rest during the five years preceding the accident.

Gussie Parrott, wife of employee and a practical nurse, testified that before the accident her husband's health was good. He worked steady and made no complaints about chest pains or shortness of breath. She said he now complains of pain in the chest, back and under the left arm. When he does any kind of work his lips turn purple and his pulse will miss beats. She said she checked her husband's pulse at St. John's Hospital and many times thereafter, and found it rapid and irregular.

Dr. Arthur E. Strauss, called as a witness for employee, testified that he practices internal medicine and cardiology. At the request of the attorney for the employee he took an electrocardiogram of the employee but did not examine or question him in reference to his condition. Based on his examination of the electrocardiogram and the St. John's Hospital and Bethesda Hospital records, he gave it as his opinion that employee had a paroxysmal tachycardia (recurrent attacks of rapid heart action) and extrasystoles (the premature contraction of one or more chambers of the heart) in addition. He stated that extrasystoles involved a change in the rhythm of the heart which in medicine is also known as arrhythmia. He further testified "that on the data as I have seen it that there was no evidence of heart trouble recorded and evidenced in the St. John's Hospital record" but that now the employee had evidence of heart damage. He further testified "that there is reasonable assumption that this heart disease developed during the period from the time of the operation and its accompanying conditions," and after discussing matters contained in the St. John's Hospital record and the Bethesda Hospital record he said "this is increasing evidence that the man developed symptoms of heart disease following the operative—during or following the operative period." This witness stated that "from the electrocardiogram changes" which he noted in the one taken at the Bethesda Hospital, from the changes he noted in his own electrocardiogram, "this man could probably not safely undergo the same type of heavy physical work that he had done up to the time of * * * the hernia."

Dr. L. M. Webb, called as a witness for employee, testified that employee had been a patient of his for about five years. He said he probably saw the employee as a patient half a dozen times before August 1956. During those visits employee had not complained of anything in connection with his heart. He said that in an examination he made of the employee on the last visit prior to the accident he found no symptoms "which in any way might indicate any disability or damage to the heart." He further testified that he put the employee in the Bethesda Hospital on August 31, 1956. Before placing him in the hospital, he said he had examined him and that the employee was dyspneic. He defined this as "difficulty in breathing." He said on that visit the employee was complaining of severe pain in his heart and left shoulder and he attributed this to a disturbance in his vascular system, which accounted for the reduced blood pressure he found in the left arm, from what it was in the right arm. He also found his fingernails and lips were cyanotic. In the Bethesda Hospital the employee was under his care and that of Dr. Zillgitt. While in the hospital he diagnosed employee's condition as "a posterior cardiac infarction." However, he said that in making this diagnosis he merely repeated the interpretation placed on the electrocardiograms taken in the Bethesda Hospital by another doctor. As to the permanency of employee's condition, he thought that the employee had a "permanent scar in his heart as a result of this large infarction * * *" and said that the employee had sustained a one hundred percent disability. However, in another place in his testimony, he said the employee is "seventy-five percent disabled." He stated that the x-ray re-

port of Bethesda Hospital showed the employee's heart was markedly enlarged. When Dr. Webb was asked if he could give any estimate or opinion as to the time of the onset of employee's heart condition, he answered: "I couldn't say, I wasn't there, I couldn't say." "I don't know when the thing occurred."

He said that a thrombosis may occur in different parts of the body following an operation, but he could not say it was the cause of the employee's heart condition. Again, Dr. Webb said he knew that employee had a thrombosis (blood clot) in his heart, but further said "as to the cause of it, I couldn't say that definitely." When asked if it was possible the operation caused or could aggravate the heart condition found, he said it was "medically possible," but added, this was merely a general medical opinion and that he was not referring to the cause of employee's heart condition. He thought the employee had reached maximum improvement at the time of the hearing. On direct examination Dr. Webb was asked if the employee could work and he answered: "Well, he probably could do light work, * * * I don't think he will ever be able to do manual labor, if that is what you mean."

In employee's case in chief his counsel offered in evidence the records of St. John's Hospital and Bethesda Hospital and the electrocardiogram taken by Dr. Strauss. These exhibits were admitted without objection.

The particular parts of St. John's Hospital records pertinent to our inquiry, pointed out to the Referee by the attorney for employer and insurer, are shown as follows:

"Case Summary (Discharge Note) Herniorrhaphy, uneventful course."

"History Sheet" (With reference to the chest) "Cardiac—irregular rate & hypertension after 'flu' in 1918 for year or so." (On the history sheet were the following notations:) "D.O.E.–P.

N.D." (which were interpreted by the attorney for the employee to mean "No dyspnea on exertion and no paroxysmal nocturnal dyspnea.")

"Physical Examination—Date 7–31–56"

"Chest—Heart—rate 68—pulse 68. Rhythm irregular—occasional missed beats about 5–10 per minute—not enlarged to percussion."

"Impression * * * 3. Cardiac arrhythmia—first degree block."

"Anesthesia Record—Preoperative—Circulatory—irregular rhythm."

"Progress Notes * * * Heart: Arrhythmia, missed beats; radial cardiac present;
Operative note * * * The patient tolerated the procedure well.—Awake & coherent * * *;
8–5–56 No complaints; doing well."

"Nurses Notes (On August 1, the notation following the operation shows patient was returned) to division in fair condition; (at 7 P.M. on August 1) up and walked in room—assisted back to bed * * * becoming more alert * * *;
8–2–56 up & walked in hall, resting in bed—walked length of hall;
8–3–56 up and walking halls—in good spirits;
8–4–56—no complaints—in cheerful mood;
8–5–56—up in room—cheerful—no complaints;
8–6–56—slept well—up in chair for a while—no complaints—very cheerful;
8–7–56—slept well—complained of weakness—very cheerful—no complaints—up walking in halls;
8–8–56—slept well—Dr. Martin here—patient discharged, ambulatory."

The parts of the Bethesda Hospital record pertinent to our inquiry are shown as follows:

"Summary Sheet. Final diagnosis—Posterior coronary occlusion."

"History—Chief complaint—short breath,—irregular in rate of heart beating—pain of shoulder (left), pain was intermittent—
*Cardio-vascular*—irregular rate in beating of heart, palpitation—heart, no murmurs.
Impression: cardiac arrhythmia—wandering Pacemaker."

"Continuation Record—Has a posterior infarction.
Date of Discharge—Sept. 25, '56
Results—Improved.
Prognosis—Guarded."

"Electrocardiogram
Electrocardiographic Diagnosis
8–20–56 and 9–13–56—Posterior coronary occlusion
Numerous Ventricular Extrasystoles.
(On *Electrocardiogram* report of 9–13–56 appears the following:) 'Pattern a posterior coronary occlusion, appears as if occurred sometime ago, no acute char.'
Signed M. Bawell, M. D."

"X-Ray Department—The heart and great vessels appear normal in size, shape and position."

Dr. John J. Hammond, a medical specialist in internal medicine and majoring in cardio-vascular diseases, called as a witness by the employer and insurer, testified that he examined the employee on April 29, 1957. The employee complained that he had a "clot" on his heart and stated he was aware of irregular heartbeats. His examination of the employee disclosed that his blood pressure was 146/90 in the right arm and a systolic pressure of 120 in the left arm with a questionable level of diastolic pressure in that arm. He said the difference in blood pressure between the arms was not necessarily of clinical significance as far as the man's heart condition was concerned. Upon percussion the heart was within normal size. He found "the rhythm was basically regular with many extrasystoles." He said: "by basically regular we mean we had a normal sinus rhythm which was intermittently regular due to the fact that beats came in a little ahead of time or early." He explained that systoles meant "premature beats coming in" which is also known in medical nomenclature as "arrhythmia." He said that arrhythmia just means "irregularity of the heartbeat." The heart tones were normal and he found no murmurs. He made an electrocardiogram which "showed frequent ventricular premature contractions, and there was 1. short runs of tachycardia which appeared to be ventricular in type. This of course, could have been another type of tachycardia called supraventricular tachycardia, in which during the fast rate there may be some blocks in the bundle and it might mimic the ventricular type of tachycardia. Also, there was evidence of change in the myocardia on the electrocardiogram." He further testified that he found no suggestion of myocardial infarction on the electrocardiogram.

Dr. Hammond further testified that based on the physical examination made and his interpretation of the electrocardiogram, it was his "impression that this man has fairly frequent ventricular premature systoles with short runs of ventricular tachycardia or supraventricular tachycardia with bundle branch block. * * * There is evidence of myocardial change which could be due to posterior coronary insufficiency. The man does not give any history suggestive of an acute coronary accident, the only symptoms were those of the arrhythmia * * *. The electrocardiogram is not suggestive of myocardial infarction. The basic cause of the irregularity could be arteriosclerotic heart disease * * * this was not the result of the operation." He explained that tachycardia means fast beating of the heart. He said it was not uncommon for a person with premature beats to complain of a little disturbance in his chest and said they can even get a little sharp sticking sensation at the time they have a premature beat. However, this

would not be indicative of a coronary accident. By coronary accident, he said he meant a sudden blocking of an artery like a coronary thrombosis. Based on his consideration of the physical examination and electrocardiogram made of the employee and his study of the St. John's Hospital record, he said it was his opinion, based upon reasonable medical certainty, that the operation for the repair of the hernia did not have "any relation to the condition as I found on my examination at all." When asked if the operation and the attendant circumstances of the operation aggravated any pre-existing heart condition to produce the condition which he found in his examination, he answered: "Well, my opinion is simply this, in the house officer's note there of the irregularity of his heart bearts which, in his description is identical with what I heard in his heart at the time of my examination, certainly he had irregularity in the rhythm before he was ever operated." It was his opinion "that there was no aggravation." He also stated that there was not much difference between what he found and what the hospital record showed prior to the operation.

On cross-examination he testified that ordinarily when a person has an acute closure they get prolonged and rather severe pains over the breast bone, which might radiate up to the neck, both arms or to the back and that quite frequently it is accompanied by severe sweating, pallor, weakness and blood pressure drop. As to the possibility of suffering a coronary occlusion while under a general anesthesia, he said that if such occurred the patient would not feel pain, but might manifest sweating and shock. He said the St. John's Hospital record showed no shock following the operation. However, he said that taking all the evidence into consideration, he did not think the employee sustained a coronary accident or damage during the course of the operation, and he did not think he sustained an aggravation of an existing condition during the operation. He again stated that he felt the employee had a heart condition when he went into the operation, and again said, at the time the claimant was taken into surgery at St. John's Hospital he was suffering from an arteriosclerotic disease of the heart.

Dr. Hammond said there was no evidence in the Bethesda Hospital record that employee had an acute coronary occlusion. When asked about the interpretation appearing in the Bethesda Hospital record of the electrocardiograms made there, he answered, "If they mean by a posterior coronary occlusion of a slow chronic process over a period of years, then I could agree with this diagnosis. But, if they mean by that that this is an acute process, then I cannot agree with it because in the history of this patient there is no statement anywhere, either by the patient or by history taken by the house staff or anywhere of this man having such an episode that would be compatible to the acute blockage to the coronary artery." He thought the statement in the Bethesda Hospital record that the electrocardiograms showed a "pattern of a posterior coronary occlusion appears as if occurred sometime ago. No acute changes" was in keeping with the opinion that he gave.

Dr. Hammond thought employee could work and said he is able now to do work comparable to that he performed before the accident. He said "the extrasystoles certainly are not a disabling feature, so I think the man can work."

Dr. Thomas Martin, produced as a witness for the employer and insurer, testified that he operated on employee for the repair of a right inguinal hernia. He made no physical examination of employee prior to the operation, other than the one made on employee's visit to his office. He said he thought he saw employee daily while he was in St. John's Hospital and further said there was nothing in the hospital record in connection with the pulse, respiration, temperature or complaints that indicated any abnormal complications. He said employee's recuperation was steady, progres-

sive and uneventful. While at the hospital, employee at no time complained to him of any pain, trouble or discomfort in the chest and showed no sign or symptoms of having any heart attack. He further said the first time employee made any complaint about his chest and heart was on his visit to the office following his discharge from St. John's Hospital. Dr. Martin said he made no specific examination then of employee's chest or heart, but told employee to see his family doctor. He said there was no evidence of shock after the operation.

During the cross-examination Dr. Martin was asked what he thought was the cause of employee's heart condition, and he answered, "Wear and tear, arteriosclerosis," and added, "the record shows that he had some of those changes when he was admitted to the hospital." He gave it as his medical opinion that the operation did not cause employee's heart trouble or aggravate any existing heart condition he had when he entered St. John's Hospital. He said the operation had no bearing in any way on employee's heart condition. He believed that employee could perform hard work.

Dr. Malcom Bawell, called as a rebuttal witness by employee, testified his practice was that of internal medicine, which included the cardiopulmonary and cardiovascular fields. He said he read and interpreted the electrocardiograms for Bethesda Hospital and had examined those made of employee's heart. Dr. Bawell admitted that the statement contained in the Bethesda Hospital record as follows: "Pattern a posterior coronary occlusion appears as if occurred sometime ago, no acute characteristics," was his comment on the interpretation he made of the cardiogram of the employee made September 13, 1956. He was asked by the Referee, "Do you believe that during the course of preparation for surgery and in the recovery room and under the watchful eye of men of medical knowledge, that a man could have a posterior traumatic occlusion and have it go unnoticed, is that a reasonable thing?" and he

answered, "Let me say this, it would be rather unusual." The Referee after calling Dr. Bawell's attention to the portions of the St. John's Hospital records that showed the employee was in good spirits, made no complaints and was cheerful, then asked him " * * * is it likely that he had a coronary occlusion either during the operation or in recovery or during one of those days and yet leave that sort of impression with the trained people who saw him throughout the day?" and he answered: "Well, it is very unlikely." The witness then explained that there have been coronary occlusions which people never knew they had but they were "very, very unusual." The Referee then asked the witness, if under such circumstances he could tell when it occurred and what caused it, and he answered, "Well, that is a very good question and that is what I told Mr. Rodgers. That to me is a very highly equivocal point right here. I don't think anything can be proven. * * * When it happened, I'm not that good, I can't answer that * * *." (Mr. Rodgers was the attorney for the employee.)

■■ Before our summation of the evidence, we said that if there is sufficient evidence to support the award it must be affirmed. Mindful of this rule, we need only look to the testimony given by Dr. John J. Hammond and Dr. Thomas Martin, and there we find sufficient, competent evidence to support the award of the Industrial Commission. Before examining the evidence given by Drs. Hammond and Martin, we should point out the woefully weak nature of the testimony offered by employee to sustain his claim. No medical authority in the case disputes the fact that employee is suffering from a "heart condition." Some slight dispute is present among the doctors as to the nature and extent of the heart condition. However, the employee had the burden of proving that his heart condition, whatever it was, resulted from the hernia operation or the incidents surrounding the operation or that an existing heart condition was aggravated by the oper-

ation or its incidents. The following brief review of the testimony offered by the employee demonstrates the weakness of his proof in this respect.

The employee admits he told the internist at St. John's Hospital that he had the flu in 1918, but he could not remember telling him about the irregular rate of heart beat, a note of which appeared in the hospital record. No doubt this lack of recollection on the part of employee seemed strange to the Referee and the Industrial Commission in view of the history contained in the St. John's Hospital record and the findings of the physical examination made of the employee prior to the operation. These findings were a part of the hospital record. The employee never denied making the statement appearing in the history of the case. He said he did not remember making it. The Referee and the Industrial Commission could have found that he did make the statement and, thus, was aware of his heart condition before the operation. He said he complained to the nurses and to Dr. Martin. The doctor denied this and the hospital record shows no complaints. The Referee and the Industrial Commission could have found that he made no complaints. It must be remembered that the St. John's Hospital record was introduced by the employee as a part of his case.

Dr. Strauss said employee had paroxysmal tachycardia and extrasystoles. It was his opinion that this developed *during or following* the operative period. This opinion was based on a finding by Dr. Strauss, among other findings, that the St. John's Hospital record showed no evidence of heart trouble, which finding is contrary to the contents of the hospital record. The opinion of this doctor as to the time employee's heart trouble developed is worthless, because it is based on an incorrect assumption that the St. John's Hospital record showed no evidence of heart trouble. The fact is, the St. John's Hospital record showed findings almost identical with those found by him from his reading of his own electrocardiogram.

The opinion given by Dr. Webb that employee was suffering from "a posterior cardiac infarction" was really not his own. In giving his opinion he merely repeated and adopted the interpretation placed on the electrocardiograms, taken at the Bethesda Hospital, by Dr. Bawell. He apparently had no independent opinion on the employee's heart condition. Dr. Webb could not say when the heart condition occurred. He could not say the operation was the cause of employee's heart condition and could not say definitely what did cause the condition.

The St. John's Hospital record offered in evidence by the employee showed a heart condition prior to the operation, comparable to the condition found by Drs. Strauss, Hammond and Bawell after the operation. This record shows employee's course in the hospital was uneventful. It shows no complaints and contrary to the testimony of the employee it shows he was cheerful while in St. John's Hospital.

The comment by Dr. Bawell appearing in the Bethesda Hospital record to the effect that employee's heart condition "appears as if occurred some time ago, no acute characteristics," is not helpful to employee. The significant part of this comment is that which shows the heart condition was not the result of an acute attack. The Referee and the Industrial Commission could have interpreted this to mean, it was not the result of a sudden onset, did not come on speedily, rather, it was the result of a slow chronic process.

The substance of the testimony given by Dr. Bawell shows he found "a posterior coronary occlusion." He thought it would be "rather unusual" for such an occlusion to occur during surgery or its incidents and go unnoticed by the doctor and others in attendance. He said it was "very unlikely" it occurred during the operation or the recovery period in view of the hospital record which showed no complaints. The important and significant portion of his testimony, which supports the award of the

Industrial Commission, was that in which he said he could not tell when the employee's occlusion took place, adding he had so informed the attorney for the employee.

It must be remembered that the aforesaid was the employee's evidence, and when it is further remembered that it was employee's burden to produce evidence to show he sustained a heart condition which resulted from the hernia operation or one of its incidents or to show that the hernia operation or one of its incidents aggravated an existing heart condition, it becomes highly questionable whether the aforesaid evidence was sufficient to sustain employee's burden. No one doubts the existence of employee's heart trouble. But it was necessary for employee to show more than the existence of a heart condition. It was incumbent upon him to show that the operation or one of its incidents caused the existing heart condition or aggravated a previous heart condition.

However, when we examine the testimony given by Drs. Hammond and Martin it becomes increasingly evident that the award of the Industrial Commission was correct.

Dr. Hammond said there was not much difference between his findings and those shown in the record of the St. John's Hospital prior to the operation. He thought the basic cause of employee's heart condition was sclerotic heart disease. He was certain that the hernia operation or its incidents did not cause the heart condition he found and did not aggravate any preexisting heart condition. His reasons for these opinions were amply supported, as shown in our summation of his testimony. It is sufficient to point out here his testimony wherein he said that employee had a heart condition when he entered St. John's Hospital comparable to that he found on his examination made some time after the operation.

According to the testimony of Dr. Martin, employee's recovery was uneventful and at no time did employee complain of any pain or discomfort in the chest while in the hospital. He showed no signs or symptoms of having had a heart attack while in the hospital and showed no shock after the operation. Dr. Martin said employee's heart condition was caused by "wear and tear" and that the hernia operation neither caused the heart condition nor aggravated an existing heart condition. He was unequivocal in his opinion that the operation had no bearing on employee's heart condition.

The aforesaid testimony produced by the employee and insurer was ample to support the award of the Industrial Commission.

■ In another point presented by employee he contends that the Referee erroneously and unreasonably excluded competent, material and important evidence offered by the employee on rebuttal. The principal contention in this regard is that the Referee excluded rebuttal testimony "pertaining to whether claimant's condition was disabling." Employee contends that this was new matter introduced by the employer and insurer in their case. The new matter referred to by employee was the testimony of Dr. Hammond that employee was able to do work comparable to the work he performed before the accident and the testimony of Dr. Martin that he believed employee could perform hard work. Testimony on the employee's ability to work was adduced in the employee's case in chief. The employee testified he has not been able to work since the injury. Dr. Strauss testified that employee could probably not safely undergo the same type of heavy physical work he performed before the operation. Dr. Webb testified he did not think employee would ever be able to do manual labor. Any rebuttal testimony on this matter offered by employee would have been repetitious and, therefore, was improper rebuttal.

Under this same point employee contends that the testimony of Dr. Hammond presents for the first time the defense that there was nothing wrong with the em-

ployee. No such testimony was given by Dr. Hammond. He found a heart condition which he did not attribute in any way to the operation or its incidents. The same is true of the testimony given by Dr. Martin. There is nothing in their testimony in this regard that constitutes new matter or a new defense.

Under this same point the employee complains that the Referee did not permit Dr. Bawell to testify in rebuttal that the attack occurred during or immediately after the administration of the anesthetic. Employee said this was to rebut new matter introduced by the employer and insurer. We doubt seriously that Dr. Bawell would have so testified and there was no new matter introduced by the employer and insurer that would have justified such rebuttal testimony. The fact is that Dr. Bawell testified he could not say when the attack occurred and had so informed Mr. Rodgers. Employee further complains that Dr. Bawell was not permitted to explain his comment appearing in the Bethesda Hospital record. We think Dr. Bawell was permitted to testify fully on the primary fact issue which was, what caused the heart condition and when it occurred. Dr. Bawell made it clear he did not know what caused it and when it occurred.

■■ There was no new matter of any kind introduced by the employer and insurer that required the introduction of rebuttal evidence. It rests within the sound discretion of the trial court whether it will permit rebuttal testimony where such testimony would be merely repetitious and cumulative. Picarella v. Great Atlantic & Pacific Tea Co., Mo.App., 316 S.W.2d 642.

■ In one of his points employee charges that the Referee erred in rejecting competent and material evidence offered by him. Dr. Strauss was asked by the attorney for employee to give his opinion on the accuracy of the diagnosis made by the internist when he examined the employee at the time of his entry in St. John's

Hospital. An objection to this question was sustained by the Referee. This question asked one expert to give his opinion about the correctness of an opinion given by another expert. An opinion by an expert must be based either upon facts known to him or upon facts assumed to be true, stated in a hypothetical question. Hays v. Hogan, 273 Mo. 1, 200 S.W. 286, loc. cit. 292, L.R.A. 1918C, 715. It is not the function of the expert to assume the responsibility of determining the correctness of the diagnosis made by another expert. That is the function of the trier of the facts.

Under this same point employee charges that he was not permitted to question the doctor about the "causation of the operation." Frankly, we do not understand the question propounded by the attorney for the employee. However, we need not rule the point, because immediately after propounding the question, counsel informed the Referee "I'll withdraw that question" admitting that the information sought had been covered in another question.

■ In his final point employee complains that he was required to include in a hypothetical question propounded to Dr. Strauss adverse factors contained in the record of St. John's Hospital. At the time the hypothetical question was asked, an objection was made by the attorney for the employer and insurer on the ground that the question failed to include certain factors contained in the St. John's Hospital record, introduced by employee. Before the Referee had an opportunity to rule on the objection, the attorney for the employee said, "I would be glad to put that in the question" and later said, "that amendment is certainly agreeable to me." The employee is now in no position to complain.

The same complaint is made about a hypothetical question propounded to Dr. Webb. The same objection was made and the following then took place:

"Mr. Rodgers: Well, may we amend our question so as to direct the doctor's

attention to the points which Mr. Luke has brought out in the hospital record?

"Referee Meyer: You would like the doctor to consider those facts also?

"Mr. Rodgers: Correct."

Again, we must rule that the employee is now in no position to complain.

Finding no error, the judgment of the Circuit Court affirming the findings and award of the Industrial Commission should be affirmed by this court. It is so ordered.

WOLFE, P. J., and ANDERSON, J., concur.