**Emlus GREER, Claimant-Appellant,**

v.

**MISSOURI STATE HIGHWAY DEPARTMENT and Hartford Accident and Indemnity Company, Defendants-Respondents.**

No. 8099.

Springfield Court of Appeals.

Missouri.

Dec. 12, 1962.

Dempster & Edwards, Sikeston, for claimant-appellant.

Evans & Dixon, John R. Dixon, St. Louis, for defendants-respondents.

RUARK, Presiding Judge.

This is an appeal by employee-claimant from the order of the circuit court affirming the final award of the Industrial Commission which denied compensation. The sole question is whether there was causal connection between an accident which occurred on April 6, 1959, and a coronary occlusion thereafter which resulted in myocardial infarction.

■ Claimant, 56 years old, height 5'10", weight approximately 187 pounds, had been employed at common labor in the black-smith shop of employer for seven years. Sometimes he did heavy work and sometimes "not too heavy." He had no history of, nor does the record show that he had been examined for, "heart trouble." His physician had treated him for "other things but never for heart."

On Monday, April 6, 1959, fairly early in the afternoon, he was engaged in cutting two-inch galvanized water pipe into different lengths and welding them. He had a twenty-foot length of pipe which had a kink or bend in it. As he had been accustomed to doing theretofore, he carried the pipe outside, stuck one end under a roller of a concrete mixer and over the frame of the vehicle; then he prepared to sit down on the extended length so as to use the weight of his body in bending the pipe straight. He put both hands on the pipe (about three feet off the ground) and put his right leg over it, but it slipped or twisted in his hands "real quick" and he fell. In so doing he received a jerk or strain in his chest. He did not fall completely to the ground. He did not receive any direct blow or direct trauma to his chest. (Note: The lack of any such direct blow was considered by some of the medical witnesses to be important in forming their opinion concerning causal connection.)

At the time of or immediately following the fall, he experienced pain in his chest. He walked over and sat down. He felt that he was smothering and could hardly breathe. He sat for about twenty minutes and then got in his truck and went home. After he got home he drove to Morehouse to see Dr. Sarno, his family physician. He says he told the nurse at the doctor's office what had happened, "and she gave me a shot and some medicine." Claimant's witness, Dr. Sarno, testified that claimant gave a history that "he thought he had a cold. He had an upper respiratory infection. As a matter of fact he came to my office and I was not there and my nurse gave him penicillin for

it." Claimant went back home and started taking his medicine. He stayed off work and at home on Tuesday and Wednesday (April 7 and 8). The pain in his chest remained about the same. On Thursday and Friday (April 9 and 10) he went back and worked those two days. Then he was home the following four days, still with his pain. He then went back "and tried to work some more for the next three days" (the 15th, 16th and 17th), although he still had the pain in his chest and his nose bled quite a bit. The pain got worse, and on the 18th he called his doctor, and the result of that call was he met the doctor at the hospital a little before noon. He was admitted to the hospital and immediately placed under oxygen for four days. He remained in the hospital for six weeks. While in the hospital he had electrocardiograms taken on April 20 and April 25.

Doctors testifying for both claimant and employer seem to agree that claimant (at some time prior to April 25) suffered a coronary occlusion and myocardial infarction; that he now suffers from that, with accompanying angina and with shoulder-arm syndrome as a result. It also seems to be agreed that claimant was and had been for an undetermined period suffering from arteriosclerosis or hardening and narrowing of the arteries.

Dr. Sarno, who is a practicing physician and surgeon with experience in heart cases, was of the opinion that when he first saw and examined claimant on the 18th he was "in the process of suffering an acute coronary thrombosis." In answer to a hypothetical question he stated that it was "very possible" the incident of the fall or jerk could have caused or brought on the thrombosis, and in his opinion it did. He testified that anyone can have a heart attack in bed or just walking down the street, but he felt that the fact claimant was working and did some physical exertion immediately prior to onset of pain was a very significant factor. Asked if there were not just as strong a probability that the pipe-straightening incident was simply a coincidence

instead of a causative factor, he stated, "It is a very fine line that you draw here. It is just hypothetical whether you could have it and then have an accident or whether the accident caused this condition. I feel the accident definitely caused this condition because I have known Mr. Greer for many, many years and I have never known him to have any heart trouble and by the same token I have just made the statement anyone can have a coronary that has had no clinical heart trouble. I just can't help from believing the relationship of this injury to the mechanism of his heart attack is not a direct causal relationship factor."

Dr. Popp, M.D., a specialist in internal medicine and witness for claimant, testified that he examined claimant and the EKG's of April 25 and April 20 on July 15, 1959, and on occasions thereafter. He was of the opinion that claimant suffered from arteriosclerotic heart disease with residual angina after myocardial infarct. He believed that the infarct occurred between April 20 and April 25, since the EKG of April 20 did not show it. He stated that the causative factors of heart attacks are many and are not necessarily associated with strenuous activity. He said, however, he felt the accident was a contributing factor to claimant's disability. He based this upon the fact the pain began at that time. He stated that he could not answer whether it was "just as probable" that the onset of the illness and the accident were coincidental as distinguished from the fact of the accident's being a causative factor; but he thought that the stress of such incident contributed to the illness. His theory was that stress causes the blood pressure to go up and that if an arteriosclerotic condition exists, it is possible for some of the inner layer to break loose and cause a thrombosis.

Employer's witness, Dr. Davis, a physician specializing in internal medicine and senior instructor on the subject at St. Louis University, examined claimant on June 24, 1959, took his history and also examined the EKG's and made some more. He was of the opinion that claimant already had some heart damage when the April 20 EKG was taken. He stated that ordinarily a man who suffers a myocardial infarction would be unable to return to his job within a few days, and he doubted very much that claimant could have suffered one and returned to work for three days. In answer to a hypothetical question incorporating the history and events, he stated that the accident had nothing to do with the myocardial infarction; that these occur to people in all walks of life, more often in those with sedentary occupations. He thought the infarction was purely coincidental and was not related to claimant's occupation in any way. He was of the opinion that claimant's infarction occurred shortly before he was hospitalized, probably on April 18. It was possible, though not probable, it occurred on April 6. He did *not* believe that strain or stress might cause a piece of the inner lining of a degenerated artery to break loose and cause it (in contradiction of a theory suggested by Dr. Popp). That myocardial infarction comes from hardening of the arteries and would not be hastened by a strain or jerk. That statistically speaking such attacks come at any time of day or night regardless of what the individual is doing. That only 2% of attacks occur after hard physical exertion and that approximately 2% of every person's waking life, including sedentary work, involves doing something which is strenuous. That strain has nothing to do with precipitating an infarction such as that suffered by claimant. That the thrombosis (clot) of the coronary artery forms on a rough place in the inner lining of the artery and remains until it blocks the blood vessel. It is the result of degeneration of the artery. The blocking of oxygenated blood supply causes parts of the heart muscle to die. A blood clot that floats in the blood stream will generally go into the lungs. In 99.9% of the cases a clot which causes coronary occlusion is formed at the heart and continues to form until it blocks the blood vessel; and there was in this case no evidence of a clot having been formed anywhere else. It was the doctor's opinion that claimant's infarction

probably did not happen at the time of the accident; but if it did so happen, it was purely a coincidence. That angina or heart pain results from insufficient blood supply and sometimes precedes myocardial infarction, and that an individual can suffer from angina for a long time and suddenly have an infarction, or he may live out his life and never have one.

Employer's witness, Dr. Miller, assistant professor of clinical medicine and internist whose practice is approximately half heart, lungs and circulation, made the same examination and inquiry as that made by Dr. Davis. He testified that the highest incidence in coronary occlusion occurs in men between 50 and 60 years of age; that claimant had blood vessels which were older than they should be for his age, and he had a calcified plaque in the aortic arch. He was of the opinion that up to the time of the EKG on April 20 claimant had hardening of the arteries and some damage to the heart muscle. He was suffering from atherosclerosis (deposits of lipids in little plaques in the walls of the blood vessel.) He said that, while many factors are involved, this is the chief cause of occlusions. He stated that the plaques previously mentioned do not flake loose and float. They are found in the wall of the vessel. A clot can form on the plaque and cause a blocking of the artery. He testified that the heart damage claimant had sustained prior to the April 20 EKG occurred over the last several years of his life; that if it had occurred within a period of a few days the EKG would have looked different; that claimant suffered his infarction after April 20. The condition he had on April 20 was something which had developed over a period of time. He expressed the opinion that the basic cause of claimant's condition was hereditary background, diet, and obesity; that there was no causal connection between the pipe-straightening incident and the occlusion which caused the infarction; that an occlusion can come suddenly or gradually, but what claimant was doing on April 6 had nothing to do with what he complained of on that day; that strenuous exercise does not precipitate a coronary attack, but continuous and sustained effort may do so; that he had no aneurysm of the aorta; that claimant could have had a mild anginal seizure on April 6 caused by a spasm because the heart muscle was not getting enough oxygen. Many times an individual has angina resulting from insufficient blood supply; he can have it for many years, either before or after a coronary. Angina happens when the arteries contract or become narrow and do not let enough blood through. He stated he did not agree that physical strain would bring about or precipitate a coronary occlusion, and in this particular instance claimant would have had it had he been home in bed.

Based on the foregoing evidence, the referee found that the accident of April 6 resulted in injury to claimant's heart and awarded him temporary total disability.

The Industrial Commission, by divided vote, found in substance that: (1) The findings of the referee were not supported by competent and substantial evidence. (2) The heart attack did not result from the accident of April 6, 1959. (3) Claimant was suffering from arteriosclerosis. The incident did not cause or contribute to the heart attack which occurred approximately two weeks later; that it would be speculation and surmise to connect the two events. (4) The employee thought he was suffering from a cold. In the light of all the evidence, the only reasonable inference is that employee's disease had reached the point where he was feeling intermittent chest pain because the disease had narrowed the artery so that insufficient oxygen-carrying blood was getting through to the heart. This was the terminal stage of his disease and was not connected with the accidental event. (5) The evidence shows that after the April 6 event claimant was up and around, driving his truck, and that he worked at his employment a certain number of days. Under the evidence, if he had sustained an infarction, he would have been too ill to do so. (6) According to the evidence, the

EKG's show that the infarction occurred between April 20 and April 25; that the basic cause of claimant's disability comes from arteriosclerosis. The finding of the referee was reversed and an award entered denying compensation.

One commissioner dissented, stating as his reasons: (1) The pain immediately following the April 6 incident is a classic sign of angina pectoris, which in turn is a classic symptom of myocardial insufficiency. (2) The evidence shows employee had had no previous symptoms and his heart difficulties began instantaneously with the accident. The inference is that the accident caused or contributed to the condition. (3) The infarction is of relatively minor importance. Claimant's primary disability is myocardial insufficiency as evidenced by angina. It is this which makes his disability.

On appeal the circuit court found the final award of the commission was sustained by competent and substantial evidence and affirmed the award.

In this case there appears to be little or no dispute that claimant was subject to a physical condition which made the onset of a coronary occlusion possible, if not probable. The real question in a nutshell is, did the pipe-bending incident, the twist, the fall, and the jerk, aggravate this condition or precipitate the occlusion which in turn caused the infarction and resultant disability? Claimant's doctors felt that it did. Respondent's medical witnesses were of the opinion that there was no connection between the accident and the occlusion; that it would have happened anyway. The majority of the commission decided to give credence to the opinions of the latter. Now we are asked to overrule that decision.

■ It is not our province to weigh the evidence and substitute our judgment on the evidence for that of the commission. Our review is limited to determining whether such tribunal could have reasonably made its findings and reached its result upon the evidence before it. If there is competent and substantial evidence upon which to base the award and if such award is not clearly contrary to the law or the overwhelming weight of the credible evidence, we are bound to affirm it. This general rule has been stated so often that we feel it is unnecessary to recite authority. The mere statement of the rule necessarily carries the implication of deference to the commission in respect to its findings on disputed questions of fact. The finding of the commission need be based upon only a reasonable probability. Karch v. Empire Dist. Elec. Co., 358 Mo. 1062, 218 S.W.2d 765; Lunsford v. St. John's Hospital, Mo.App., 107 S.W.2d 163, 166; Gardner v. Ford Motor Co., Mo.App., 130 S.W.2d 201(6); Leonard v. Fisher Body Co., St. Louis Division of General Motors Corporation, Mo.App., 137 S.W.2d 604, 610. However, "neither may a fact be found, nor a claim or defense, nor an award be based upon mere speculation, suspicion or conjecture." Shrock v. Wolfe Auto Sales, Inc., Mo., 358 S.W.2d 812(4).

The appellant says the award is not supported by evidence substantial to dispute or overcome the very substantial evidence offered by the claimant.

"Who shall decide when doctors disagree?" [1]

■ A settled rule of law is that, where the right to compensation depends upon the acceptance of one of two conflicting medical theories, the question to be determined is one of fact to be weighed by the commission, and we are not to disturb the finding unless the commission acted unreasonably in accepting testimony which was not substantial or in deciding the case against the overwhelming weight of the evidence. Vollmar v. Board of Jewish Ed., Mo., 287 S.W.2d 868, 872; Cole v. Best Motor Lines, Mo.App., 303 S.W.2d 170; Teel v. F. Burkart Mfg. Co., Mo.

1. Alexander Pope, Moral Essays, Epistle III.

App., 271 S.W.2d 259; Sams v. Hayes Adhesive Co., Mo.App., 260 S.W.2d 815; Clark v. Frazier-Davis Const. Co., Mo. App., 258 S.W.2d 934; Kerby v. Missouri State Highway Commission, Mo.App., 238 S.W.2d 464, 470; Jones v. Remington Arms Co., Mo.App., 209 S.W.2d 156; Valdes v. Emerson Elec. Mfg. Co., Mo. App., 216 S.W.2d 947; see Meldrum v. Southard Feed & Mill Co., 229 Mo.App. 158, 74 S.W.2d 75.

■■ It has been held that, in determining whether the commission could reasonably have made its findings, the court will look only to the evidence most favorable to the award, together with all reasonable inferences that tend to support it, and will disregard all opposing and unfavorable evidence, even though the finding of the commission to the contrary would also have been supported by evidence. Love v. Land, Mo.App., 356 S.W.2d 105 (1); Schmidt v. Rice-O'Neill Shoe Co., Mo.App., 226 S.W.2d 358, 362 (and cases there cited); Thacker v. Massman Const. Co., Mo., 247 S.W.2d 623(2); Erwin v. Railway Exp. Agency, Mo.App., 128 S.W. 2d 1077. "It is true that claimant presented testimony which, had it been accepted by the Commission, would have supported an award in claimant's favor. But the Commission was not compelled to believe this testimony. The Commission was at liberty to reject all or any part of the testimony which it did not consider credible, and accept as true contrary evidence adduced by the respondents. The Commission also had the right to accept parts of the testimony of the physician testifying for claimant, and the physician who testified for respondents,—it being the province of the Commission to resolve conflicts in the evidence and give probative value to only that part which has the ring of truth in it." Sams v. Hayes Adhesive Co., Mo.App., 260 S.W.2d 815, l. c. 819. And there is also much authority for the statement that, in the final analysis, the claimant has the burden of proving that his disability is the result of an accident sustained in the course of his employment. De Lille v. Holton-Seelye Co., 334 Mo. 464, 66 S.W.2d 834(4); Bolen v. Wallace, Mo., 338 S.W.2d 73; Doughton v. Marland Refining Co., 331 Mo. 280, 53 S.W.2d 236; Francis v. Sam Miller Motors, Mo., 282 S.W.2d 5(2); Alexander v. Saunders Mills, Inc., Mo. App., 289 S.W.2d 483(4).

■ The opinions of the medical experts, who by their training and experience possess superior knowledge of a subject concerning which we ordinary folks are incapable of deducing correct conclusions, when based upon examination and adequate data and reasons to support them, and when not the result of mere guess or speculation, are substantial and competent evidence. Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844; Kimmie v. Terminal R. Ass'n of St. Louis, 334 Mo. 596, 66 S.W.2d 561; Waterous v. Columbian Nat. Life Ins. Co., 353 Mo. 1093, 186 S.W.2d 456; Clark v. Frazier-Davis Const. Co., Mo.App., 258 S.W.2d 934, 938. [As are expert medical opinions upon hypothetical assumptions based on facts in evidence. Parrott v. Kisco Boiler & Engineering Company, Mo. App., 332 S.W.2d 41(8).]

■ We agree with appellant that an opinion of a doctor rendered without any basis for knowledge and unsupported by adequate reasons would be purely guess and speculation and not substantial evidence. See Stepaneck v. Mark Twain Hotel, Mo. App., 104 S.W.2d 761, 766; Christ v. St. Louis Malleable Casting Co., Mo.App., 213 S.W.2d 636(2); Bolen v. Wallace, Mo., 338 S.W.2d 73, 77. But it would appear to us that all doctors who testified for both parties were well qualified in their profession and that they had the advantage of having the history of the case, of having examined the claimant personally, and of having "read" the electrocardiograms. Quite obviously, the events which occurred within this man's body were not open to visual inspection, as a cut on the foot or a black eye would have been. The doctors to some extent "see" conditions through

electrocardiograms. From these, the history of the case, and such facts as they are able to observe on personal examination, they form their opinions. Where the opinion of a doctor is based upon those means of knowledge which are regarded by the medical profession as sufficient, the appellate court cannot act as a jury and say the opinion is without "supporting 'reasons and testimony.'" Schaefer v. Rechter, Mo., 290 S.W.2d 118, 124.

Nor can we say that the award is contrary to the overwhelming weight of the evidence. We have been referred to various texts, treatises, and statistics in reference to the subject involved. We have read them with much interest; but we feel that we are no more competent to use and apply them than would a member of the medical profession be competent to interpret and render decision upon an involved and disputed legal point. All we get from these treatises is that medicine is not an exact science, that doctors do disagree, and that we should stick to our own last and leave questions of medicine and medical theory to the doctors, and, in case of dispute between them, to the trier of the fact, who must of necessity give more credence to one or the other. This has been the steadfast attitude of the courts. An examination of some of the "heart" cases in the appellate courts in this and other states indicates that sometimes apparently conflicting results have been reached, but this comes because the medical profession itself is sometimes in conflict.[2]

2. Those interested in the subject might examine Kerby v. Missouri State Highway Commission, Mo.App., 238 S.W.2d 464; Schaefer v. Rechter, Mo., 290 S.W. 2d 118; De Lille v. Holton-Seelye Co., 334 Mo. 464, 66 S.W.2d 834; Parrott v. Kisco Boiler & Engineering Company, Mo.App., 332 S.W.2d 41; Vollmar v. Board of Jewish Ed., Mo., 287 S.W.2d 868; Meldrum v. Southard Feed & Mill Co., 229 Mo.App. 158, 74 S.W.2d 75; State ex rel. Hussman-Ligonier Co. v. Hughes, 348 Mo. 319, 153 S.W.2d 40; Jones v. Remington Arms Co., Mo.App.,

We have no alternative except to hold that the award found by the majority of the commission was supported by competent and substantial evidence and must, therefore, affirm the judgment of the circuit court in sustaining the award. It is so ordered.

STONE and McDOWELL, JJ., concur.

209 S.W.2d 156; Clevenger v. Standard Steel Works, Mo.App., 230 S.W.2d 113; Powers v. Universal Atlas Cement Co., Mo.App., 261 S.W.2d 512; see also Walker v. St. Louis Public Service Co., 362 Mo. 648, 243 S.W.2d 92; Karch v. Empire Dist. Elec. Co., 358 Mo. 1062, 218 S.W.2d 765*; Erholtz v. Balkan Mining Co., 245 Minn. 73, 70 N.W.2d 863.

───

* We consider the Karch case, cited above, more an authority on the family life of Ozark ticks than as a final authority on diseases of the heart.