**Harley J. JOINER, Appellant,**

v.

**FARMERS EXCHANGE COOPERATIVE ASSOCIATION, NO. 304 (Employer), M. F. A. Mutual Insurance Company (Insurer), Respondents.**

**No. 23780.**

Kansas City Court of Appeals.

Missouri.

June 3, 1963.

———◆———

Earl E. McCleave, Kansas City, for appellant.

J. F. Allebach, Robert L. Ross, Allebach & Ross, Albany, for respondents.

BROADDUS, Presiding Judge.

This is an appeal by the employee from the order of the Circuit Court affirming the final award of the Industrial Commission which denied compensation.

The employer, Farmers Exchange of Mt. Moriah, Missouri, operated a grocery store, produce buying station, a service station and a trucking service. Appellant, Harley J. Joiner, age 45, had been employed by the Farmers Exchange for 4 years as general handyman. He worked in the gasoline service station, waited on trade in the grocery and feed store, unloaded eggs and produce and operated the truck owned by the employer.

Appellant's regular hours of employment were from 7:00 A.M. to 6:00 P.M. However, when he was operating the truck he usually started at 6:00 P.M. and worked until he had finished. He received

overtime pay after 6:00 P.M. On Monday, May 9, 1960, which would have been two days before appellant suffered the heart attack, he delivered fuel and worked at the service station until 3:00 P.M. Appellant then loaded stock and hauled the stock to St. Joseph. It was 11:00 P.M. when the stock was unloaded and he went to bed in St. Joseph shortly after that time. He was up at 6:15 A.M. on Tuesday, May 10th, and turned in a feed order at the M. F.A. Farm Supply. After appellant ate breakfast, he loaded feed at the M.F.A. Supply and at Houston Feed in St. Joseph. The method used was that the feed would be wheeled out to the truck and appellant helped load it on the truck. Appellant then left St. Joseph and arrived in Mt. Moriah at about 2:30 P.M. About 2½ tons of the feed was for Paul Wright of Mt. Moriah and it did not take very long to unload this feed, as Wright had two men to help appellant. After unloading Wright's feed appellant went to the respondent's warehouse to unload the remainder of the feed. Appellant was informed that he was to go back to St. Joseph with a load of hogs after the feed was unloaded. There was about 5½ tons of feed remaining on the truck to be unloaded at respondent's warehouse, and appellant unloaded about 4 tons of this without help. Clarence Rinehart, manager of respondent's business, helped unload the other 1½ tons. The size of the load of feed was not unusual and the method of unloading the feed was exactly the same whether appellant had help in unloading or not. This method was to pick up the 50 pound or 100 pound bag of feed, place it on the shoulder, walk out of the truck down a ramp, and place it on a pile. After the feed was unloaded, appellant drove his truck to Cainsville and loaded some hogs which were taken to St. Joseph. He then returned from St. Joseph and went to bed at his home in Mt. Moriah at about 12:30 A.M. When he arrived home he was tired.

Appellant went to work the next morning, Wednesday May 11th, 1960, at 7:00 A.M. He worked in the store until about 8:15 A.M. when, while changing eggs from a 12 or 15 dozen case to a 30 dozen case, he suffered a heart attack. The chores he did at the store on Wednesday morning were the same that he ordinarily did. He had lifted eggs from a 15 dozen case to a 30 dozen case many times before in the course of his employment.

During the 4 years that appellant had worked for respondent he had done practically all of the trucking of livestock and also hauled all of the feed. There were times when he had made as many as four trips per week to St. Joseph with livestock. Livestock is ordinarily hauled at night. On numerous occasions appellant would stay all night in St. Joseph and bring back a load of feed the next day. The feed would then be unloaded with the help of Mr. Rinehart, and on a few occasions appellant would then take another load of livestock back to St. Joseph. He would, on these occasions, get back to Mt. Moriah about midnight and go to work at 7:00 A.M. on the following morning. After getting to work on these occasions he would do the same chores that he did on the morning he suffered the attack. Appellant was working at his regular speed on the morning of the heart attack. Appellant testified that he was angry and upset when he found out he would not have help in unloading the feed on Tuesday afternoon and unloaded the feed at a faster pace than he usually did. Appellant had not previously suffered from a heart condition, and the first pains that he had, were when he was handling the eggs at about 8:15 A.M. Wednesday, May 11th, 1960.

Dr. Albert F. Nibbe, M.D., a general practitioner of Bethany, Missouri, treated appellant at the Bethany Hospital at 9:00 A.M. on Wednesday, May 11th, 1960, and testified for appellant.

Appellant was hospitalized with a diagnosis of possible coronary occlusion. Electrocardiograms and laboratory tests confirmed that there was a damage to the anterior of the heart. He was kept in bed for about two weeks and then allowed to

be up in a chair for an additional seven days before being discharged from the hospital on May 31st, 1960. The final diagnosis was an anterior myocardial infarction with a secondary complication first degree heart attack. Prior to the attack appellant suffered a coronary artery disease, atherosclerosis, which is a condition in which deposits are laid down within the lining of the coronary arteries of the heart. This disease would have eventually been disabling. Dr. Nibbe, in answer to a hypothetical question, stated: "I feel that the amount of physical activity which is described and also the amount of emotional frustration which this particular patient would be likely to develop, with my understanding of his personality, would be a participating cause for the type of heart attack which he sustained."

Dr. F. Stanley Morest, M.D. of Kansas City, Missouri, a heart specialist with 30 years experience, testified on behalf of respondent. He examined appellant on March 10th, 1961, and from his examination and a review of the hospital records of the Memorial Hospital at Bethany he agreed with Dr. Nibbe's diagnosis of acute myocardial infarction, small size lesion. Appellant had good and standard treatment and made a good recovery. In answer to a hypothetical question setting out the facts in the case Dr. Morest gave an opinion that the activities of appellant had no particular bearing on the heart attack. Dr. Morest further testified that a heart attack precipitated by over exertion will occur within $2\frac{1}{2}$ to 5 hours after the exertion, and in this case, the time interval was too great for exertion to have been the cause of the attack.

The Industrial Commission found that appellant "did not sustain an accident on or about May 11th, 1960, arising out of and in the course of his employment." And: "We further find from the credible evidence that the employee has failed to prove that his heart attack resulted from or was causally related to the alleged accident."

The late and well considered case of Greer v. Missouri State Highway Department, Mo.App., 362 S.W.2d 773, is very similar to the instant case on the causation issue. In the language of the Court, 362 S.W.2d at page 774, the problem presented was:

"* * * The sole question is whether there was causal connection between an accident which occurred on April 6, 1959, and a coronary occlusion thereafter which resulted in myocardial infarction."

As in the instant case, the referee found that causation existed and the Industrial Commission reversed the finding of the referee. The Circuit Court affirmed the Industrial Commission and was in turn affirmed by the Springfield Court of Appeals.

Claimant's doctors testified that the infarction was caused by an accident and employer's medical witnesses testified there was no connection between the accident and the infarction.

The role of the Courts in this dilemma is stated by Presiding Judge Ruark, 778 of 362 S.W.2d:

"It is not our province to weigh the evidence and substitute our judgment on the evidence for that of the commission. Our review is limited to determining whether such tribunal could have reasonably made its findings and reached its result upon the evidence before it. If there is competent and substantial evidence upon which to base the award and if such award is not clearly contrary to the law or the overwhelming weight of the credible evidence, we are bound to affirm it. This general rule has been stated so often that we feel it is unnecessary to recite authority. The mere statement of the rule necessarily carries the implication of deference to the commission in respect to its findings on disputed questions of fact. The finding of the commission need be based upon only a reasonable probability. Karch v. Empire Dist. Elec. Co., 358 Mo. 1062, 218 S.W. 2d 765; Lunsford v. St. John's Hospi-

tal, Mo.App., 107 S.W.2d 163, 166; Gardner v. Ford Motor Co., Mo.App., 130 S.W.2d 201(6); Leonard v. Fisher Body Co., St. Louis Division of General Motors Corporation, Mo.App., 137 S.W.2d 604, 610."

Again at page 778 of 362 S.W.2d the Court states:

"A settled rule of law is that, where the right to compensation depends upon the acceptance of one of two conflicting medical theories, the question to be determined is one of fact to be weighed by the commission, and we are not to disturb the finding unless the commission acted unreasonably in accepting testimony which was not substantial or in deciding the case against the overwhelming weight of the evidence." (Citing cases.)

On this issue, the testimony of Dr. Morest, a heart specialist of 30 years experience, supplies the competent and substantial evidence to support the finding of the Commission that the activities of claimant Joiner did not cause the heart attack.

In the transcript there is set out a hypothetical question to Dr. Morest which was answered as follows:

"A. My opinion is that these duties, as described in the question, of the day before the heart attack, had no particular bearing on this man getting the heart attack at that time."

The question, and answer to it, alone, is competent and substantial evidence to support the finding of the Industrial Commission. Suppose the situation had been reversed and the answer to this hypothetical question had been that the heart attack was caused by the activities outlined in the question. Would it be seriously argued that such a question and answer would not be substantial and competent evidence on the issue of causation and therefore would support an award for appellant?

The transcript contains further testimony of Dr. Morest which would satisfy the test of competent and substantial evidence on this issue. For example, he testified that heart attacks after heavier than normal activity would occur within 2½ to 5 hours. In this case the activity relied upon by appellant Joiner was completed by 5:00 P.M. on May 10th, and the first pains appeared at approximately 8:15 A.M. on May 11th, which would be some 15 hours later.

It is clear that the finding of fact by the Industrial Commission that the activities of appellant were not causally related to the heart attack is supported by competent and substantial evidence and this finding should not be disturbed by this Court. It therefore follows that the issue as to whether an accident within the meaning of the Workmen's Compensation Act occurred is no longer of any importance because compensation would be payable following an accident only if that accident were the cause of the resulting injuries.

The judgment is affirmed. All concur.